**UNITED STATES of America,**

v.

**Richard JAMES, Ronald Mallay, Baskinand Motillal, and Betty Peter, Defendants.**

**No. 02 CR 778(SJ).**

United States District Court, E.D. New York.

Jan. 4, 2006.

_____

Roslynn R. Mauskopf, Esq., United States Attorney, EDNY, Brooklyn, NY, By Tracy Lee Dayton, Esq., Lisa J. Kramer, Esq., Lawrence Philip Ferazani, Esq., for the United States.

Brafman & Ross, P.C., New York, NY, By Charles Albert Ross, Esq., for Defendant Betty Peter.

Ephraim Savitt, Esq., New York, NY, for Defendant Richard James.

Steve Zissou & Associates, Bayside, NY, By Steve Zissou, Esq., for Defendant Richard James.

Kaplan & Katzberg, New York, NY, By Kenneth J. Kaplan, Esq., for Defendant Ronald Mallay.

Law Offices of Richard Jasper, New York, NY, By Richard Jasper, Esq., for Defendant Ronald Mallay.

Robert Curtis Gottlieb, Esq., Commack, NY, for Defendant Baskinand Motillal.

## MEMORANDUM & ORDER

JOHNSON, Senior District Judge.

Defendants Richard James ("James") and Ronald Mallay ("Mallay") are each charged in a nineteen-count indictment with various counts of racketeering, murder, attempted murder, mail fraud, and money laundering, relating to an allegedly fraudulent scheme to obtain life insurance policies for people of Guyanese ancestry. Presently before the Court are motions by James and Mallay to suppress certain statements and documentary evidence seized by the government.

In his suppression motion, Mallay seeks to preclude introduction at trial of insurance policies and other documents seized by law enforcement officials from his apartment on the date of his arrest. Mallay contends that the documents at issue were not within the investigating officers' plain view and thus were impermissibly seized during a warrantless search. Mallay also seeks to suppress certain post-arrest statements made to arresting officers on the ground that he was subjected to custodial interrogation without the benefit of *Miranda* warnings, in violation of his Fifth Amendment rights. *See Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

Defendant James seeks to suppress certain post-arrest statements made to arresting officers, on the ground that he had the right under the Fifth and Sixth Amendments to be represented by counsel during his custodial interrogation because an indictment was pending against him. James also moves for suppression of pre-arrest, recorded statements made to a cooperating individual, on the ground that his Sixth Amendment right to counsel was violated when federal law enforcement officials authorized the cooperator to question James in the absence of counsel after an indictment was pending against him.

Both James and Mallay also seek to suppress out-of-court identifications made by a government witness on the ground that the identification procedures used by the federal agents were unduly suggestive.

The Court referred Defendants' motions to Magistrate Judge Cheryl Pollak for a report and recommendation. Accordingly, Magistrate Judge Pollak conducted a sup-

pression hearing on July 21, 2005, as well as a *Wade* hearing on September 22, 2005 on the issue of the identification procedures used by the investigating agents. *See United States v. Wade*, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967). On the basis of the hearings and related pleadings, Magistrate Judge Pollak issued a Report and Recommendation (the "Report") on November 10, 2005. The Report recommended that (1) Mallay's motion to suppress the evidence seized from his residence be denied; (2) Mallay's motion to suppress his post-arrest statements be denied; (3) James' motion to suppress his post-arrest statements be denied; (4) James' motion to suppress the recorded conversations to the cooperating individual be denied; and (5) James' and Mallay's motions to suppress the photograph identification be denied.

A district court judge may designate a magistrate to hear and determine certain motions pending before the Court and to submit to the Court proposed findings of fact and a recommendation as to the disposition of the motion. *See* 28 U.S.C. § 636(b)(1). Within ten days of service of the recommendation, any party may file written objections to the magistrate's report. *See id.* Upon *de novo* review of those portions of the record to which objections were made, the district court judge may affirm or reject the recommendations. *See id.*

The Court is not required to review the factual or legal conclusions of the magistrate judge as to those portions of the report and recommendation to which no objections are addressed. *See Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985). In addition, failure to file timely objections may waive the right to appeal this Court's Order. *See* 28 U.S.C. § 636(b)(1): *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15, 16 (2d Cir.1989).

In this case, objections to Magistrate Judge Pollak's Report were due within ten days of receipt of the November 10, 2005 Report. No objections were filed with this Court. Upon review of the Report, this Court therefore adopts and affirms the Report of Magistrate Judge Pollak in its entirety.

SO ORDERED.

## *REPORT AND RECOMMENDATION*

### *THE MOTIONS TO SUPPRESS*

POLLAK, United States Magistrate Judge.

Defendants Richard James and Ronald Mallay face various counts, including RICO charges, and charges of murder and attempted murder, relating to a fraudulent scheme to obtain life insurance policies on people of Guyanese ancestry.[1] Currently pending before this Court are motions by defendants James and Mallay to suppress certain statements and documentary evidence seized by the government.

Specifically, defendant Mallay seeks to preclude introduction at trial of the insurance policies and other documents seized from his apartment on the date of arrest. He contends that during the course of a warrantless search conducted at the time of his arrest, the investigating officers seized papers from inside a plastic file box. Mallay also seeks to suppress certain post-arrest statements made to the arresting officers. In his affidavit, Mr. Mallay claims that only after he had been forcibly

---

1. The charges in the indictment and the procedural history leading up to these motions to suppress are set forth more fully in this Court's Report and Recommendation, dated October 12, 2005.

taken to the precinct and questioned was he advised of his *Miranda* rights. (Mallay Mem. at 14; Mallay Aff. ¶¶ 9, 11–12).[2] Since the questioning was not voluntary and he did not receive *Miranda* warnings prior to questioning, Mallay contends that the statements should be suppressed. (*Id.*) He also claims that he was detained for a "couple of hours," "his native language is not English,"[3] and that once advised of his *Miranda* rights, he declined to speak to the officers, which he argues demonstrates that he would not have spoken to them earlier if given the warnings before questioning. (*Id.* at 15–16).

Defendant James also seeks to suppress certain post-arrest statements as well as recorded statements he made to a cooperating individual after an indictment was filed and his right to counsel had attached. (*See* James Mem.[4] at 29–32; James Supp. Mem.[5] at 13–14).

## PROCEDURAL AND FACTUAL BACKGROUND

### A. *Affidavit Requirement*

As an initial matter, some courts have held that in the absence of a sworn affidavit attesting to the facts, the defendant is not entitled to a hearing on the issue of voluntariness. *United States v. Pena,* 961 F.2d 333, 339 (2d Cir.1992). Indeed, the Second Circuit has made it clear that the court has the discretion to deny an evidentiary hearing where the defendant has failed to submit papers that raise a dispute over a material issue of fact, *see United States v. Caming,* 968 F.2d 232, 236 (2d Cir.), *cert. denied,* 506 U.S. 956, 113 S.Ct. 416, 121 L.Ed.2d 339 (1992), or where the defendant has failed to support his factual allegations with a sworn affidavit from a witness with personal knowledge. *See, e.g., United States v. Gillette,* 383 F.2d 843, 848 (2d Cir.1967).

At the same time, however, the Second Circuit has held that a defendant's mere allegation that the agents did not administer *Miranda* warnings, despite the government's claim to the contrary, is sufficient to require a hearing. *See United States v. Mathurin,* 148 F.3d 68, 69–70 (2d Cir. 1998). Here, defendant Mallay has submitted an affidavit claiming that he was not advised of his rights and defendant James' counsel affirm the description of the circumstances of James' arrest. In this Court's view, these are sufficient to raise the issue of voluntariness and warrant a hearing.

Accordingly, in an exercise of discretion, this Court ordered a hearing in this matter to determine the propriety of the seizure of papers from Mallay's home, and the

2. Citations to "Mallay Mem." refer to the Memorandum of Law in Support of Defendant Ronald Mallay's Pre–Trial Motions, filed December 20, 2002. Citations to "Mallay Aff." refer to the Affirmation of Ronald Mallay, dated December 12, 2002.

3. The Court notes that though the Guyanese patois requires translation (*see* Transcript of Hearing before this Court on June 29, 2005 ("Tr. I") at 78), the government argues that "[t]he national language of Guyana is English. The people in Guyana speak English. They may have some dialect." (*Id.* at 77–78.) Agent Oldham, an investigator on the case (*see* Transcript of Hearing before this Court on July 21, 2005 ("Tr. II") at 83), testified that English is Mallay's native language. (*Id.* at 128). Mr. Kaplan, attorney for defendant Mallay, acknowledges that "[a]bsolutely, they [the defendants] do ... understand English." (Tr. I at 10–11.)

4. Citations to "James Mem." refer to the Memorandum of Law in Support of Defendant Richard James' Pre–Trial Motions, filed April 4, 2005.

5. Citations to "James Supp. Mem." refer to defendant James' Memorandum of Law, filed August 15, 2005.

voluntariness of the statements made by James and Mallay.

## B. *The Hearing*

During the suppression hearing held on July 21, 2005, the government presented the testimony of Eugene Kizenko, a Special Agent with the Bureau of Immigration and Customs Enforcement ("BICE").[6] (Tr. II at 4). The defense called William Oldham, formerly a detective with the New York City Police Department ("NYPD") and an investigator for the United States Attorney's Office in the Eastern District of New York ("USAO").[7] (Tr. II at 83, 96).

Agent Kizenko testified that in January 2001, he became involved in an investigation of James and Mallay in connection with a scheme in which James, an insurance broker, allegedly wrote life insurance policies on certain individuals, and Mallay conspired with others to have the insureds murdered in order to obtain the proceeds of these policies. (*Id.* at 5–6).

### 1) *The Arrest of Mallay and the Search*

In late August of 2002, a warrant for Mallay's arrest was issued based upon a complaint, charging him with conspiracy to commit interstate or foreign murder-for-hire, identifying two alleged victims, Mr. Somaipersaud and Mr. Sewnanan. (*See* Tr. II at 8–9). At a little after 7:00 a.m., on September 3, 2002, Agent Kizenko, two

INS agents, and officers from the Major Case Squad of the NYPD arrived at Mallay's home, located at 50–10 Broadway, Woodside, Queens to effect his arrest. (*Id.* at 9).

Using a ruse to obtain entry, the officers asked Mallay's wife, Lazina Mallay, if they could use the phone. (*Id.* at 10). She opened the door and let the officers enter the apartment. (*Id.*) The officers then dispersed throughout the apartment, conducting a protective security sweep to see who was in the house. (*Id.* at 11).[8] Agent Kizenko went into the kitchen with Ms. Mallay (*id.* at 10); other agents found Mr. Mallay seated, possibly asleep, on the couch in the living room where he was placed under arrest and handcuffed. (*Id.* at 10, 99). The Mallays' son, Donald Mallay, was found sleeping in the second bedroom. (*Id.* at 19, 81, 121).

Detective Oldham proceeded to the master bedroom where he found a stack of eight to ten insurance policies on the dresser. (*Id.* at 11–13, 100, 103). He recognized the documents because they had laminated covers, frequently with a blue rear backing, which he knew were often used to bind insurance policies. (*Id.* at 100–01). He called out to Agent Kizenko "a minute or so" later, stating that he had found something. (*Id.* at 11). Agent Kizenko went into the bedroom where he observed a "stack" of what appeared to be

6. Agent Kizenko testified that prior to March 2003, he had been an agent with the Immigration and Naturalization Service ("INS") since June 1992. In March 2003, INS became part of BICE. (Tr. II at 4).

7. Detective Oldham began investigating Mallay and James in January of 2001, while a detective with the NYPD. (*See* Tr. II at 5). He left the NYPD in November of 2001 to become an investigator for the USAO in the Eastern District of New York. (*Id.* at 83). In that position, he continued to investigate the

case until he resigned from the Office on May 19, 2005. (*Id.*) He testified that he did not "bring" the case to the USAO when he became an investigator; the case had already been under investigation before he left the NYPD. (*Id.* at 96).

8. At the time of arrest, the officers had information suggesting that Mallay may have been involved in more than one murder and there was a concern for the officers' safety. (*Id.* at 120).

insurance policies on the top of the dresser. (*Id.* at 12). Although he described them as not perfectly stacked in a neat pile, Agent Kizenko testified that he could see the writing on some of the policies. (*Id.* at 14, 35–36). He testified that some of them said "insurance policy" on the front and he could see the dark cover of one (*id.* at 12), which appeared to be similar to the Met Life policies he had seen earlier during the course of the investigation. (*Id.* at 6–7, 78).

He and Detective Oldham took the stack of policies into the kitchen where they reviewed them with Ms. Mallay. (*Id.* at 15–16). According to Agent Kizenko, some of the policies were in the name "Mallay," which Ms. Mallay explained were policies belonging to certain relatives. (*Id.* at 16–18). Other policies were in different names and the agents suspected that these policies were possibly part of the fraudulent scheme. (*Id.* at 16–17). After reviewing the policies with Ms. Mallay, the officers told her that they were taking the policies but would return the ones that belonged to her within a short period of time. (*Id.* at 18). Indeed, several days later, the agents returned the majority of the policies to Ms. Mallay. (*Id.* at 17–18).

During the hearing, Agent Kizenko was questioned as to how he recognized the documents to be insurance policies. He explained that during the course of the investigation, he and his co-case agent Detective Oldham became familiar with the general appearance and format of the types of insurance policies at issue. (*Id.* at 6). The investigation appears to have been initiated after Met Life contacted the government. (Tr. I at 85). As part of the investigation, Agent Kizenko spoke to employees of the insurance company and obtained numerous policies from the company. (Tr. II at 6). Moreover, at the time of James' arrest in June 2002, prior to the

arrest of Mallay, the agents executed a search warrant of James' office where numerous insurance policies were seized. (*Id.* at 19, 119). Agent Kizenko and Detective Oldham reviewed these seized policies as well. (*Id.* at 19, 119, 120). Both officers testified that generally policies were bound together with a dark blue backing and a white or clear laminated top cover. (*Id.* at 6–7, 100–01).

Detective Oldham, who was called as a defense witness, confirmed Agent Kizenko's testimony about finding the insurance policies on the dresser in the bedroom (*id.* at 100), though Detective Oldham recalled the dresser being to the right of the door (*id.* at 103), not the left as Agent Kizenko testified. (*Id.* at 12). The detective testified that he too had seen "dozens" of insurance policies before, and that when he saw the documents on Mallay's dresser, he recognized the laminated covers that are often used to bind insurance policies. (*Id.* at 100–01, 118). The detective confirmed that he and Agent Kizenko reviewed the policies with Ms. Mallay, and then subsequently returned the majority of the policies to her the next day. (*Id.* at 124).

On cross-examination, Agent Kizenko conceded that although he prepared a report of the interview of Mr. Mallay (*id.* at 54–56), he had not prepared a memorandum of his interview of Ms. Mallay. (*Id.* at 53). Nor had he prepared an inventory of either the policies taken from the Mallays' apartment or the ones returned to Mallay's wife (*Id.* at 39), although he testified that approximately seven were returned to Ms. Mallay. (*Id.* at 77). Agent Kizenko explained that if he had taken custody of the documents, he would have prepared an inventory, but since the USAO took the policies, he did not do so. (*Id.* at 33). Nor were there any transmittal documents prepared recording the

transfer of the documents from the agent to the USAO. (*Id.*).

Following his arrest, Mr. Mallay was transported to the office of the Major Case Squad. (*Id.* at 19). Agent Kizenko could not, however, recall if he was in the car when Mallay was transported to the Major Case Squad from the apartment (*id.* at 62), but he clearly testified that Mr. Mallay was not questioned in the apartment before he was taken to the precinct and advised of his rights. (*Id.* at 76).

Once in the squad, pedigree information [9] was taken and Mallay was given his *Miranda* warnings. (*Id.* at 20). Present in the room at the time the warnings were given were Agent Kizenko, Detective Oldham and Mr. Mallay, who was handcuffed. (*Id.* at 21). According to Agent Kizenko, Detective Oldham advised Mallay of his rights using a card from which the detective read each of the warnings. (*Id.* at 22, 23). Mallay was then asked if he understood the warnings. (*Id.* at 24). According to the agent, Mallay understood and spoke English, said he had no problem understanding the warnings and agreed to speak to the officers. (*Id.*) There were no threats made and no weapons drawn. (*Id.* at 23, 26). Mallay did not indicate that he had any medical problems or complaints, although the agent may have given him a glass of water. (*Id.* at 20, 26).

Mallay agreed to speak to the officers. (*Id.* at 24). Detective Oldham conducted the questioning while Agent Kizenko took notes and ultimately prepared a report. (*Id.* at 54–56, 175, 178).[10] The officers spoke to Mallay for approximately one hour during which he admitted knowing co-defendant James and having gone to Guyana with James. (*Id.* at 25). When asked if he knew Hardeo Sewnanan, he told the officers that Mr. Sewnanan had been poisoned in Guyana, and that Mr. Sewnanan was his nephew. (*Id.* at 25; *see also id.* at 21). He said that he had received $400,000 in insurance proceeds as a result of his nephew's death. (*Id.* at 25). Mallay also stated that he knew another victim, Alfred Gobin, who was murdered in 1996. (*Id.* at 25). Mallay told the officers that one of his nephews was married to Gobin's granddaughter and that Mallay received $60,000 in insurance proceeds from Gobin's policy, which he gave to Gulobie Gobin. (*Id.*) He also indicated that he knew Devadas Harichand, who was his cousin and the common law husband of his sister. (*Id.*) According to Agent Kizenko, Mallay did not inculpate himself in any way during the interview. (*Id.* at 26).

The agent conceded that there was nothing in his report that reflected when or even if *Miranda* warnings were given. (*Id.* at 64–65). He conceded that Mallay was not given a form to execute, verifying that he had been given the proper warnings (*id.* at 63–64), but the agent testified clearly that the warnings were administered by Detective Oldham. (*Id.* at 22).

---

**9.** Pedigree information is biographical information needed to process an individual, such as date of birth, address, and names of associates. (*Id.* at 22).

**10.** Defendant's counsel argue that the date on the agent's report has been changed or back-dated. (*See id.* at 55–56). Agent Kizenko testified that he did not remember if he had prepared the report on September 3, 2002, the day Agent Kizenko brought Mallay to the USAO. (*Id.* at 56). The report appears to have a typed date at the bottom which was altered by hand to reflect a date of September 3, 2002. (*Id.* at 55). Although defendant argues that the typed number underneath reflects an October date, the agent denied that. (*Id.* at 55, 56). When asked if it was "a fact [that] this report was prepared after September 3, 2002," Agent Kizenko responded that he "[didn't] have a specific recollection." (*Id.* at 56).

Detective Oldham also confirmed the agent's testimony regarding the post-arrest interrogation, testifying that Mallay was not questioned in the apartment or in the car. (*Id.* at 126). Although the detective was not certain, he believed that Mallay was given his *Miranda* rights either in the car or in the squad room, or both. (*Id.* at 107–108, 127). He testified that Mallay understood his rights and wished to speak to the officers. (*Id.* at 127–129).

### 2) *The Arrest and Questioning of James*

Agent Kizenko and Detective Oldham also testified about the investigation and arrest of James on June 30, 2002. (Tr. II at 18, 118, 147). On June 27, 2002, a warrant was issued for James' arrest based on an indictment charging him with conspiracy to use interstate commerce facilities in the commission of murder-for-hire, in violation of 18 U.S.C. § 1958. (*See generally id.* at 142, 170, 174).[11] Prior to the issuance of the warrant, the agents and NYPD officers had been investigating James in connection with the insurance fraud scheme. For two to three months prior to his arrest, James was communicating with a cooperating individual, Derrick Hassan. (*Id.* at 163–64). According to Detective Oldham, Derrick Hassan knew James and Mallay, had engaged in criminal activity with them before Hassan met Detective Oldham, and had provided the officers with information about them. (*Id.* at 193, 229). During the course of the investigation, a decision was made to have Mr. Hassan engage in recorded conversations with James. (*Id.* at 192–93).

Once the decision was made, Mr. Hassan was given instructions by the investigators and the Assistant United States Attorneys ("AUSAs"). (*Id.* at 196). He was given a recording device by the government (*id.* at 183), and instructed to use it to record conversations with James. (*Id.*) Generally, Hassan would tell the agents when a meeting was planned with James and then the device was given to him "every single time." (*Id.* at 184–185). Agent Kizenko acknowledged, however, that Hassan may also have had his own recorder which he used for recording phone calls with James. (*Id.* at 184).

Agents and NYPD officers, including Detective Oldham, conducted surveillance of James and Hassan during this period prior to June 30, 2002 while Hassan was speaking with defendant James. (*Id.* at 229–32). Detective Oldham testified that while he did not have the ability to listen to the conversations between James and Hassan as they were occurring, he did review the conversations after the fact. (*Id.* at 197). The conversations were in English and began a few months before James' arrest. (*Id.* at 198). During the course of these conversations, it was learned that James was involved in a plot to kill John Singh[12] and the primary reason for Mr. Hassan to speak with James was to develop evidence of this plot. (*Id.* at 198–203). The officers were also investigating other possible murders that were connected to the scheme in which they believed James might be involved. (*Id.* at 230–32). One of the things James had told Hassan was that they should kill John

---

11. On September 27, 2002, a second indictment was filed, adding a new charge against defendant James and adding a second defendant, Mallay. The third superseding indictment of May 21, 2004 (hereinafter "Third Superseding Indictment") is the current indictment.

12. The victim is referred to as "John Narinesingh" in the Indictment. (*See* Third Superseding Indictment Counts Twelve and Thirteen).

Singh the same way James had killed Hardeo Sewnanan, with poison. (*Id.* at 230). The two also spoke on occasion about the insurance fraud scheme and James told Hassan about other insurance policies he had issued. (*Id.* at 231–32).

On the night of June 30, 2002, the officers were conducting surveillance at the home of James' girlfriend, Malini Ramnarine. (*Id.* at 200–01).[13] A warrant had been issued for James' arrest based on an indictment that was filed on June 27, 2002, charging James with conspiracy to travel and to use the mail and facilities in interstate commerce in the commission of murder-for-hire. (*Id.* at 164–65). Agent Kizenko testified that he was aware that between the filing of the indictment on June 27, 2002 and the time of James' arrest, James spoke twice to Hassan, once on the day of the arrest and once the day before, June 29, 2002.[14] (*Id.* at 165).

According to Agent Kizenko, James was under surveillance so they would "know where he was." (*Id.* at 171). The agent conceded that although the officers knew where James was prior to June 30, 2002, no efforts were made to arrest him until it was learned that he was traveling to the airport to leave the country. (*Id.* at 168–173). The officers knew that Hassan was going to pick James up to drive him to the airport, and they decided to wait to arrest James until after he had been picked up. (*Id.* at 172). The agent testified that it was his understanding that the officers had a certain period of time in which to arrest a person and that the timing was a matter in the officers' discretion. (*Id.*) The officers knew they had to arrest James that evening because he "was fleeing the country" to Guyana. (*Id.* at 172–73). They wanted to arrest him before he got to the airport, and Agent Kizenko conceded that they knew it would be helpful if James had another conversation with Hassan while he was driving him to the airport. (*Id.* at 173–74).[15]

Detective Oldham testified that he participated in the surveillance of Ms. Ramnarine's home about a half hour before the arrest. (*Id.* at 201). Detective Oldham conceded that one of the reasons for the recorded conversation with Hassan was to obtain information about the John Singh plot, but the purpose was not limited to collecting information on just the murder of John Singh; "[t]here were a number of murders." (*Id.* at 202–03). The detective acknowledged that in prior conversations, James had discussed John Singh. (*Id.* at 204). However, the detective denied giving the informant specific instructions as to what to say that day, stating:

> If Mr. Hassan hadn't gathered at that point what we were interested in, a con-

---

**13.** Although Agent Kizenko testified that he believed the surveillance on Ms. Ramnarine's home began after noon, he did not personally join the team until around 9:00 p.m. that night when it was learned that James was leaving. (*Id.* at 168–69).

**14.** The agent was uncertain whether the first conversation on the 29th of June had been in person or over the telephone. (*Id.* at 165–66). He was also uncertain as to whether surveillance had been conducted of the conversation on June 29, 2002, noting that he was not personally a participant on that day. (*Id.* at 167). Agent Kizenko did testify that he "believe[d]" the conversation on June 29 was

recorded. (*Id.* at 166–67). The government was asked to provide this Court with transcripts of Mr. Hassan's recorded conversations with James. Although there is a transcript of a conversation made on the night of the arrest, June 30, 2002, the government did not provide this Court with any transcripts for the day before, June 29, 2002. (*See* discussion *infra* note 26 and accompanying text).

**15.** The agent testified that in June 2002, he was unaware that a person cannot be recorded if the individual has already been indicted. (*Id.* at 188). He learned it only during the course of preparing for the hearing. (*Id.* at 187).

spiracy involving the murder of John Singh, or any other murders, I don't think there would be any point telling Mr. Hassan that. Mr. Hassan is no dope.

(*Id.* at 205–206).

At approximately 9:00 p.m., the officers observed James getting into Hassan's vehicle supposedly on their way to the airport. (*Id.* at 147–48). Officers from the NYPD, including Detective Oldham, pulled the car over and placed James in handcuffs. (*Id.* at 148, 208). Detective Oldham testified that he transported James to the Major Case Squad and that James was advised of his rights in the squad room.[16] (*Id.* at 213–14). He was not advised of his rights at the scene because the officers wanted to get James out of the area and away from other people who might recognize him. (*Id.* at 215). The plan was to arrest James quickly and get him out of the area before the community could find out about the arrest. (*Id.* at 208). Detective Oldham explained that the officers felt there were other co-conspirators and they were hoping James might cooperate and assist the officers in the investigation. (*Id.*)

Detective Oldham also testified that it would have been difficult to advise James in the car as they were transporting him to the precinct because it was dark. (*Id.* at 216). Although they "certainly didn't ride in silence" back to the squad room, Detective Oldham testified that the officers did not talk to James about cooperation during the car ride. (*Id.* at 217–18). Agent Kizenko testified that at the Major Case Squad, he took notes and Detective Old-

ham questioned James. (*Id.* at 175, 178). Although Detective Oldham ultimately prepared the report, the detective took no notes himself. (*Id.* at 175, 219–20). Detective Oldham testified that he did not take notes but he prepared the report that night in part from memory. (*Id.* at 220; *see* Ex. E). He could not recall if he consulted anyone else's notes. (*Id.* at 220–21). Among those present in the room with the defendant James during the questioning were Agent Kizenko, Detective Oldham, and William Haley, a former and now retired NYPD detective. (*Id.* at 149, 218).

According to Agent Kizenko, the officers first obtained biographical information from James, questioning the defendant about his date of birth, where he lived, place of birth, whether he had a wife or girlfriend, whether he had any children. (*Id.* at 177). Then Detective Haley read James his *Miranda* warnings. (*Id.* at 149, 214). Like the warnings given to defendant Mallay, the warnings were read to James from a standard card issued to NYPD officers. (*Id.* at 110, 150–51, 216).[17] According to Agent Kizenko, James appeared to understand everything that was being said to him, and he agreed to speak to the officers without an attorney being present. (*Id.* at 149, 151). Detective Oldham confirmed that during the interview James appeared to understand what was being said, understood the *Miranda* warnings, and gave responsive answers to the pedigree and other questions asked. (*Id.* at 234).

Agent Kizenko testified that during the hour between the time of Mr. James' ar-

---

**16.** Originally, the detective testified that the warnings were given in the car but he changed his testimony after reviewing the report which stated that the warnings were given at 10:00 p.m., which would have been back at the office. (*Id.* at 214, Ex. E.).

**17.** Detective Oldham conceded that James was not given a waiver form; the rights were read from a card. (*Id.* at 216).

rest and the time that the officers began to obtain the pedigree information from Mr. James, no threats or promises were made to induce Mr. James to talk. (*Id.* at 149–50). During the time James was in the room with the officers, he was in handcuffs, but none of the officers had their weapons drawn and no one threatened him in any way. (*Id.* at 150). James never indicated that he needed any medical treatment nor did he have any other requests, except possibly for some water which was given to him. (*Id.* at 151, 154).

Among other things, the officers questioned James about the driver of the vehicle. (*Id.* at 152). James told them that the person was a taxi driver, and that James was not familiar with him, but that James had known him for several days. (*Id.*)

The officers asked James if he knew John Singh, and if he knew Mallay. (*Id.* at 153). James indicated that he knew them both but that he had had a falling out with Mr. Mallay. (*Id.*) He did not, however, indicate why. (*Id.*) The officers asked what James did for a living and where his office was located. (*Id.* at 152, 154). James told the officers that he was an insurance agent and that his office was on Liberty Avenue, in Queens. (*Id.* at 152, 154). With respect to the approximately $7,000 in cash and a double endorsed check which the agents found on his person at the time of arrest, James explained that he was taking it to someone in Guyana that evening. (*Id.* at 152). He was asked about his father who had died in a mysterious fashion and about other family members. (*Id.* at 179). He was asked about Malini Ramnarine, where she lived, how long

James had known her and whether she had anything to do with the insurance policies that had her name on them. (*Id.* at 179–80). James told the officers that "she had nothing to do with this." (*Id.* at 180). On cross-examination, Detective Oldham conceded that he probably told James that his girlfriend was in a lot of trouble and could be arrested, and that she might do better if James cooperated. (*Id.* at 223–25).

Agent Kizenko testified that James was asked a second time about John Singh. (*Id.* at 155). At that point, James asked for an attorney and the questioning ceased. (*Id.* at 155–56).[18] According to Agent Kizenko, the interview lasted for approximately an hour before James asked to speak to an attorney. (*Id.* at 154, 156). After he made his request for counsel, James was taken to the Metropolitan Detention Center for lodging overnight because it was too late to take him to court. (*Id.* at 154–55).

The next morning, July 1, 2002, the agent contacted Mr. James' attorney, Steve Zissou, Esq., and the officers then met with Mr. James and Mr. Zissou. (*Id.* at 156). A waiver of speedy arraignment was executed at that time. (*Id.* at 157).[19]

## DISCUSSION

### A. *Mallay's Fourth Amendment Claims*

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." *See United States v. Lee*, 916 F.2d 814, 818 (2d Cir.1990) (considering Fourth

---

**18.** Detective Oldham corroborated the agent's testimony that James did not ask for an attorney until he was asked a second time about John Singh. (*Id.* at 227–28). At that point, the interview stopped. (*Id.* at 227).

**19.** The government has indicated that it does not seek to introduce at trial any of the statements made by James following the execution of the Waiver of Speedy Arraignment. (*Id.* at 163).

Amendment interest in abandoned suitcase). With few specific exceptions, a warrantless search is "*'per se* unreasonable under the Fourth Amendment.'" *United States v. Kiyuyung*, 171 F.3d 78, 83 (2d Cir.1999) (quoting *Mincey v. Arizona*, 437 U.S. 385, 390, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978)). While the defendant has the burden of showing that he had a reasonable expectation of privacy in the place searched, *see California v. Greenwood*, 486 U.S. 35, 39–40, 108 S.Ct. 1625, 100 L.Ed.2d 30 (1988); *United States v. Perea*, 986 F.2d 633, 639 (2d Cir.1993), the government bears the burden of demonstrating that a warrantless search falls within one of the exceptions to the warrant requirement. *United States v. Perea*, 986 F.2d at 639.

In this case, there appears to be no dispute that Mallay had a reasonable expectation of privacy in his home. Thus, the question is whether the government has established that the warrantless search was justified by one of the exceptions. One of these specifically delineated exceptions is the "plain view" exception which allows police officers to seize an object without a warrant if they "are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object...." *Minnesota v. Dickerson*, 508 U.S. 366, 375, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993); *see also United States v. Kiyuyung*, 171 F.3d at 83. In order to satisfy its burden under the "plain view" exception, the government must first establish

that the officers were lawfully in a position to view the object and second, that the incriminating character of the evidence was readily apparent.

Turning first to the question of whether the officers were lawfully in Mallay's home at the time they first observed the documents at issue, it is clear that "[t]he Fourth Amendment does not permit a warrantless entry into a suspect's home to arrest him unless the circumstances are exigent or an occupant has consented." *United States v. Vasquez*, 638 F.2d 507, 526 (2d Cir.1980), *cert. denied*, 454 U.S. 975, 102 S.Ct. 528, 70 L.Ed.2d 396 (1981). Indeed, even an arrest warrant does not authorize entry into the home of a third party to search for the individual named in the arrest warrant unless there has been a particularized judicial determination that the individual is present in the third party's home. *See Steagald v. United States*, 451 U.S. 204, 215–16, 215 n. 8, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981). Moreover, to enter a person's residence pursuant to a warrant for his arrest, an officer must have reason to believe the individual is present in the home. *Payton v. New York*, 445 U.S. 573, 603, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). Here, the government had an arrest warrant for defendant Mallay which authorized entry into Mallay's apartment for the purpose of taking him into custody. There appears to be no dispute that the officers had a valid warrant, had reason to believe Mallay was inside, or that the location where the arrest occurred and where the items were found was in fact Mallay's residence.[20]

**20.** Even if there were a question as to whether this was Mallay's home, an exception to the rule exists where an individual provides authorized and voluntary consent. *See Florida v. Royer*, 460 U.S. 491, 497, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983); *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). *See also United States v.*

*Deutsch*, 987 F.2d 878, 883 (2d Cir.1993) (holding that the government has the burden, by the preponderance of the evidence, to show that the consent was voluntary) (citing *United States v. Buettner–Janusch*, 646 F.2d 759, 764 (2d Cir.), *cert. denied*, 454 U.S. 830, 102 S.Ct. 126, 70 L.Ed.2d 107 (1981)). Here, the officers testified that Ms. Mallay consent-

██ Once lawfully inside the Mallay premises, the officers testified that they proceeded to conduct a security sweep to determine whether there was anyone else in the premises who could potentially pose a risk of danger to the officers. (Tr. II at 11, 105, 120). The Second Circuit has held that "[u]nder the 'security check' exception, when law enforcement officers have lawfully entered premises in connection with an arrest, they are entitled to make a quick and limited 'security check' of the premises to be sure there are no persons or objects on the premises to pose a safety threat to the officers." *United States v. Kiyuyung,* 171 F.3d at 83 (citing, *inter alia, Maryland v. Buie,* 494 U.S. 325, 327, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990)). Protective sweeps are to be "narrowly confined to a cursory visual inspection of those places in which a person might be hiding." *Maryland v. Buie,* 494 U.S. at 327, 110 S.Ct. 1093. If during the course of conducting a "security check," the officers observe patently incriminating evidence in plain view, they may seize that evidence without a warrant. *United States v. Kiyuyung,* 171 F.3d at 83 (citing *Minnesota v. Dickerson,* 508 U.S. at 375–76, 113 S.Ct. 2130); *United States v. Rudaj,* 390 F.Supp.2d 395, 402–03 (S.D.N.Y. 2005).

██ To conduct a security sweep, officers must have "a reasonable, articulable suspicion that the house is harboring a person posing a danger to those on the arrest scene." *Maryland v. Buie,* 494 U.S. at 336, 110 S.Ct. 1093 (citation omitted). There must be "specific, articulable facts to justify their warrantless search." *United States v. Gandia,* 424 F.3d 255, 263 (2d Cir.2005).

In evaluating the presence of specific, articulable facts to justify a protective sweep, one factor emphasized by the Second Circuit is whether the officers acted with or without a warrant to execute the underlying arrest. In finding that a protective sweep violated the defendant's Fourth Amendment rights, the court in *United States v. Gandia* noted that "[i]n the instant case—unlike when officers enter a suspect's home in order to execute an arrest warrant or under exigent circumstances—there was no need for the police officers to enter [defendant's] home in the first place." *Id.* (finding insufficient facts to justify security sweep where officers investigating reports of a dispute, possibly involving a gun, stopped the suspect outside his apartment building and then proceeded to his apartment for further questioning where the sweep uncovered a bullet); *see also United States v. Agapito,* 620 F.2d 324, 336 (2d Cir.) (finding no facts to justify protective sweep of defendants' hotel room under surveillance, after arresting defendants in hotel lobby seventeen floors below), *cert. denied,* 449 U.S. 834, 101 S.Ct. 107, 66 L.Ed.2d 40 (1980). Likewise, when considering "circumstances other than an officer's pres-

ed to the entry into the home. (Tr. II at 10). *See United States v. Garcia,* 56 F.3d 418, 422 (2d Cir.1995) (holding that to determine whether a voluntary consent has been given, the courts look to the " " 'totality of all the circumstances' " to determine whether the consent was a 'product of that individual's free and unconstrained choice, rather than a mere acquiescence in a show of authority' ") (citations omitted); *see also United States v. Kon Yu–Leung,* 910 F.2d 33, 41 (2d Cir.1990). While there is no need to show that the waiv-

er was "knowing and intelligent," *see United States v. Garcia,* 56 F.3d at 422 (holding that the concept of a knowing and intelligent waiver does not govern in the context of a Fourth Amendment inquiry), here there is no suggestion that Ms. Mallay simply acceded to the police officers' show of authority directing that entry be allowed. *See United States v. Deutsch,* 987 F.2d at 883. Rather, the officers testified that she voluntarily consented to their entry after they asked to use the phone. (Tr. II at 10).

ence in a home for the purpose of effecting an arrest," the Second Circuit found that mere "generalizations" about the dangerousness of drug couriers and their frequent meetings with contacts, "without more, [were] insufficient to justify a protective sweep." *United States v. Moran Vargas*, 376 F.3d 112, 116 (2d Cir.2004).

In cases in which officers entered the defendant's home to execute a warrant for his or her arrest, the Second Circuit has repeatedly found facts sufficient to justify a protective sweep. *See United States v. Mickens*, 926 F.2d 1323, 1328 (2d Cir.1991) (*aff'g in relevant part*, No. 88 CR 309(S–2), 1989 WL 20643, at *1 (E.D.N.Y. Feb.14, 1989) and noting that arrest was made pursuant to complaint), *cert. denied*, 502 U.S. 1060, 112 S.Ct. 940, 117 L.Ed.2d 111 (1992); *United States v. Escobar*, 805 F.2d 68, 69, 71 (2d Cir.1986); *see also United States v. Manley*, 632 F.2d 978, 979–80, 987 (2d Cir.1980) (upholding sweep of home that officers mistakenly believed to be defendant's residence). *cert. denied*, 449 U.S. 1112, 101 S.Ct. 922, 66 L.Ed.2d 841 (1981). In each of these cases, the officers conducted the security sweep based solely on evidence suggesting the presence of one or more persons in the home and on the violent or conspiratorial nature of the defendant's alleged crime. *See United States v. Mickens*, 926 F.2d at 1328 (citing officers' reason to believe one defendant and her mother were at co-defendant's house, and that co-defendant was known to be violent and to travel with others); *United States v. Escobar*, 805 F.2d at 71 (noting that defendant had not yet been arrested and that light and sound from the bedroom suggested the possible presence of third persons); *United States v. Manley*, 632 F.2d at 987 (indicating agents were aware of the presence of others and

defendant was presumed violent, likely armed, and possibly accompanied by co-conspirators).

This Court finds the protective sweep of Mallay's home to be in line with Second Circuit precedent finding a reasonable, articulable suspicion of danger sufficient to justify a protective sweep. The protective sweep was conducted following the officers' entry into the home to execute a warrant for Mallay's arrest. (Tr. II at 8–10.) Although the government's argument that Mallay was dangerous because he was suspected to be involved in several murders (*see* Govt's. Reply Mem.[21] at 4; *see also* Tr. II at 120), is similar to the generalization that was rejected by the court in *United States v. Moran Vargas*, 376 F.3d at 116, the officers in Mallay's case also had more specific information. Unlike the officers in *United States v. Gandia*, who "had no evidence ... that would indicate a third person might be hiding [in the residence]," 424 F.3d at 264, Detective Oldham and Agent Kizenko knew that Ms. Mallay was present in the home when she answered the door (Tr. II at 10), and they had reason to believe defendant Mallay was present as well. (*See* Tr. II at 9–10.). Knowing that they were arresting Mallay for conspiracy to commit murder, the officers "had security concerns" and "look[ed] for other people who could harm [them] or [their] fellow officers." (Tr. II at 120). *See also United States v. Manley*, 632 F.2d at 987 (acknowledging concern about presence of coconspirators as a factor justifying protective sweep). Accordingly, this Court finds the protective sweep of defendant Mallay's home to be justified.

In conducting the protective sweep, Detective Oldham and Agent Kizenko testified that immediately upon entering the Mallay residence, several officers secured

---

**21.** Citations to "Govt's. Reply Mem." refer to the Government's Reply Memorandum of

Law in Opposition to Defendants' Pretrial Motions, filed September 15, 2005.

Mr. Mallay on the couch in the living room (Tr. II at 10, 99); Ms. Mallay was accompanied by Agent Kizenko into the kitchen (*id.* at 10), while other officers, including Detective Oldham, fanned out through the apartment to secure the premises. (Tr. II at 10–11). The testimony of both witnesses establishes that Detective Oldham proceeded to the master bedroom, where he observed in plain view a stack of papers, sitting out in the open on the top of the bedroom dresser, which appeared to include documents resembling the insurance policies with which the detective had become familiar during the course of the investigation. (*Id.* at 6–7, 12, 78, 100–01).

Mallay argues that the officers' testimony that these insurance policies were sitting on the top of the dresser in plain view "is just not credible." (Mallay Supp. Mem. at 3–4).[22] He contends that the testimony of Agent Kizenko that the documents were "fanned out" on the dresser top conflicts with Detective Oldham's testimony that the documents were in a "neatly stacked" pile. (*Id.* at 5; *compare* Tr. II at 36–37 *with* Tr. II at 100–02, 123). Defendant further contends that instead of doing a "cursory" sweep, the officer here "took the time to examine and read documents on the Mallay's bedroom bureau." (*Id.* at 8). Thus, Mallay argues that the documents seized from the dresser were not "patently incriminating" and should be suppressed.

Although defendant contends that the items were not in plain view and that there was nothing "immediately apparent" to the agents that would suggest these documents were incriminating, the Court does not agree. As an initial matter, the Court credits the testimony of both Detective Oldham and Agent Kizenko that the documents were located on the top of the dresser and not concealed in a closed container[23] in the bedroom closet as defendant has argued. (*See* Mallay Mem. at 17). Not only did both witnesses credibly deny any familiarity with a plastic file box shown to them by counsel at the hearing (*see* Tr. II at 50, 104), but the timing of the discovery by Detective Oldham supports the officers' testimony that the documents were in plain view. Agent Kizenko testified that he heard Detective Oldham call out to him within a minute or less than a minute after the officers entered the apartment. (*Id.* at 11, 12). That timing is consistent with the detective's testimony that he walked into the master bedroom and then saw the papers sitting on the dresser to the right of the bedroom door. (*Id.* at 102, 103). If Agent Kizenko's testimony is accurate, there would not have been enough time for Detective Oldham to have walked through the apartment, searched the closet, found the file box, opened it up to discover the policies inside, and then cleared a space on the dresser on which to place the policies.[24]

---

**22.** Citations to "Mallay Supp. Mem." refer to the Supplemental Memorandum of Law in Support of Defendant Ronald Mallay's Suppression Motions, filed on August 9, 2005.

**23.** Defendant Mallay's Memorandum of Law refers to a closed "file cabinet" in the bedroom closet. (*See* Mallay Mem. at 17). However, during the course of examining the officers, Mallay's counsel showed the officers a plastic file box and asked if they had seen such a box, implying that perhaps the policies were stored in this type of a container in the closet. Regardless, the officers both testified

that the policies were lying in plain view on the top of the dresser.

**24.** Defendant points out that in the photograph of the dresser presented by the defense there are "many (personal) items on the dresser." (Mallay Supp. Mem. at 5; Ex. B–4). A date stamp on the photograph suggests that it was taken shortly before the hearing on July 14, 2005. While there was no evidence presented to suggest that the items on the dresser had not been moved since the search in September 2002, even assuming that the photograph is somewhat representative of the

Moreover, even though Mallay argues that there was no way that the officers could have recognized these documents as insurance policies simply from observation, without first searching through them, the Court does not agree. The officers had become familiar with the general appearance of insurance policies through their investigation into the defendants' fraudulent scheme, which of course centered on fraudulent insurance policies taken out in other people's names. (*Id.* at 6, 100–01, 118). The officers had reviewed numerous policies supplied to them by several insurance companies (*see id.* at 6), and they had previously executed a search warrant on defendant James' office where policies like those at issue were seized. (*Id.* at 19, 119). The Court credits the officers' testimony that by merely looking at the stack of papers, they recognized the familiar clear lucite cover and blue back on several of the policies which typically is the way these policies are bound. (*Id.* at 6–7, 100–01). Agent Kizenko further testified that there was printing on some of the documents, which also led him to believe that there were insurance policies included in the stack. (*Id.* at 78–79).

Finally, to the extent that Agent Kizenko's description of the location and state of the insurance policies as being "fanned out" on the dresser differs from that of Detective Oldham's description, no one questioned Detective Oldham as to whether he touched the documents or moved the stack of policies in any way prior to summoning Agent Kizenko to the room. Upon recognizing the stack to contain insurance policies subject to search in plain view, there would have been nothing wrong with the detective touching them or even picking them up to take them into the kitchen. *Cf. United States v. Kiyuyung*, 171 F.3d at

83 (permitting an officer to seize immediately apparent incriminating evidence during a security check); *United States v. Rudaj*, at 402–03. Thus, unlike the "glaring inconsistencies" in the officers' testimony which supported suppression in *United States v. Santos*, 303 F.Supp.2d 333, 347 (S.D.N.Y.2003) (*see* Mallay Supp. Mem. at 5), the Court finds no major conflict between the officers' testimony here.

Accordingly, based on the credible testimony of the officers, the Court finds that they were lawfully in Mallay's premises and observed these insurance policies in plain sight. Therefore, it is respectfully recommended that Mallay's motion to suppress the evidence seized from his residence be denied.

### B. *Mallay's Fifth Amendment Claims*

Mallay also moves to suppress his post-arrest statements on the grounds that he was subjected to custodial interrogation without the benefit of *Miranda* warnings, in violation of his Fifth Amendment rights.

The Fifth Amendment guarantees that "[n]o person... shall be compelled in any criminal case to be a witness against himself." In *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the Supreme Court established certain procedural safeguards to protect individuals from the coercive effects of a custodial interrogation. Thus, before a suspect may be questioned in custody, law enforcement officials must advise the individual of his right to remain silent and his right to counsel, and there must be a knowing and voluntary waiver of those rights. *Id.* at 444, 475, 478–79, 86 S.Ct. 1602. *Miranda* recognized that if the prosecution could show that the individual "knowingly and intelligently waived his privilege against

---

condition of the dresser at the time of the search, Detective Oldham would have had to

have gone to a lot of effort to rearrange the dresser in order to find space for the policies.

self-incrimination and his right to retained or appointed counsel," *id.* at 475, 86 S.Ct. 1602, then statements elicited during custodial interrogation should be admitted.

In *Edwards v. Arizona,* the Court went further and held that once an individual invokes his right to counsel, all interrogation must cease and the police are forbidden from approaching him for additional interrogation "until counsel has been made available to him," 451 U.S. 477, 484–85, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), and is present for the questioning. *See Minnick v. Mississippi,* 498 U.S. 146, 152, 111 S.Ct. 486, 112 L.Ed.2d 489 (1990). Even if the suspect, who had already invoked his right to counsel, was to respond to police-initiated questioning in the absence of counsel, there is no valid waiver and the statements would be subject to suppression. *See Edwards v. Arizona,* 451 U.S. at 484, 101 S.Ct. 1880. This rule set forth in *Edwards* was "designed to prevent police from badgering a defendant into waiving his previously asserted *Miranda* rights." *Michigan v. Harvey,* 494 U.S. 344, 350, 110 S.Ct. 1176, 108 L.Ed.2d 293 (1990). However, it is clear that "the defendant must expressly invoke his Fifth Amendment right," *United States v. Laury,* 49 F.3d 145, 149 (5th Cir.), *cert. denied,* 516 U.S. 857, 116 S.Ct. 162, 133 L.Ed.2d 105 (1995), before his rights under *Edwards* can attach.

 The government bears a "heavy burden" of proof to show that defendant understood the rights and knowingly waived those rights. *Tague v. Louisiana,* 444 U.S. 469, 470–71, 100 S.Ct. 652, 62 L.Ed.2d 622 (1980) (*per curiam*); *North Carolina v. Butler,* 441 U.S. 369, 373, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979) (holding that the prosecution bears a "great" burden to prove a valid waiver). "To prove a valid waiver, the government must show (1) that the relinquishment of

the defendant's rights was voluntary, and (2) that the defendant had a full awareness of the right being waived and of the consequences of waiving that right." *United States v. Jaswal,* 47 F.3d 539, 542 (2d Cir.1995) (*per curiam*). The question of whether the waiver was made knowingly and intelligently differs from the question of voluntariness. *Moran v. Burbine,* 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986); *see also Coronado v. Lefevre,* 748 F.Supp. 131, 138–39 (S.D.N.Y.1990).

 In assessing the validity of a waiver, courts examine the totality of the circumstances surrounding the interrogation. *Fare v. Michael C.,* 442 U.S. 707, 725, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979). In order to determine whether a statement was made voluntarily, the court must first determine whether the statement was the product of coercion on the part of law enforcement, *see Colorado v. Connelly,* 479 U.S. 157, 167, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986); *United States v. DiLorenzo,* No. S1 94 CR 303, 1995 WL 366377, at *6 (S.D.N.Y. June 19, 1995). Next, the court looks to the defendant's mental state and other factors to determine if his will has been overborne by the actions of the law enforcement officers. *See Green v. Scully,* 850 F.2d 894, 902 (2d Cir.), *cert. denied,* 488 U.S. 945, 109 S.Ct. 374, 102 L.Ed.2d 363 (1988).

In assessing the issue of voluntariness, the Second Circuit has noted that voluntariness "is a question directed to a defendant's state of mind, which can be inferred from his actions and statements." *United States v. Spencer,* 995 F.2d 10, 11 (2d Cir.) (*per curiam*), *cert. denied,* 510 U.S. 923, 114 S.Ct. 323, 126 L.Ed.2d 269 (1993). As a consequence, courts look to a variety of factors, including the defendant's age, *see United States v. Burrous,* 147 F.3d 111, 116 (2d Cir.) (finding that a sixteen year old knowingly and voluntarily waived his

Fifth Amendment rights), *cert. denied,* 525 U.S. 939, 119 S.Ct. 358, 142 L.Ed.2d 295 (1998); *United States v. Bernard S.,* 795 F.2d 749, 751–52 (9th Cir.1986) (holding that a seventeen year old is capable of valid waiver); the defendant's intelligence and education, *see United States v. Burrous,* 147 F.3d at 116; *Stawicki v. Israel,* 778 F.2d 380, 382–84 (7th Cir.1985) (holding that defendant with high school equivalent and average intelligence made valid waiver), *cert. denied,* 479 U.S. 842, 107 S.Ct. 150, 93 L.Ed.2d 91 (1986); the defendant's familiarity with the criminal justice system, *see id.* at 383–84 (holding waiver valid despite absence of express waiver where defendant had five prior arrests); and the defendant's mental condition at the time of the interrogation. *See United States v. Male Juvenile,* 121 F.3d 34, 40 (2d Cir.1997) (holding that evidence introduced regarding defendant's mental disabilities did not preclude finding that defendant knowingly waived his rights).

Courts have rejected claims that a statement was not voluntarily made even when the defendant claims that he is physically ill or intoxicated. *See, e.g., United States v. Givens,* 712 F.2d 1298, 1302 (8th Cir. 1983) (holding that intoxication alone does not render a confession involuntary), *cert. denied,* 465 U.S. 1009, 104 S.Ct. 1005, 79 L.Ed.2d 237 (1984); *Graves v. United States,* 878 F.Supp. 409, 414 (N.D.N.Y. 1995) (finding that even if the defendant was functioning with a limited capacity due to his consumption of alcohol, "there must still be some showing of official coercion" before the confession is deemed to be involuntary), *aff'd,* 89 F.3d 826, 1995 WL 767118 (2d Cir.1995); *United States v. Di-Lorenzo,* 1995 WL 366377, at *4–8 (finding that waiver was voluntary despite defendant's testimony that he was exhausted and under the influence of alcohol and crediting testimony of law enforcement officer that defendant was "clear and coher-

ent" and that he did not smell alcohol on defendant's breath).

█ Similarly, where the defendant is physically ill, either as a result of trauma or as a consequence of having ingested drugs, the courts examine all of the circumstances surrounding the confession before determining if the defendant's physical condition prevented him from understanding his rights. *See, e.g., United States v. George,* 987 F.2d 1428, 1430–31 (9th Cir.1993) (finding confession voluntary even though defendant was hospitalized from heroin overdose but indicated an understanding of his *Miranda* rights and responded intelligently to the agents' questioning); *United States v. Short,* 947 F.2d 1445, 1448, 1450 (10th Cir.1991) (finding that where the defendant did not complain about feeling too ill to answer questions, spoke to the agents intelligently, and attempted to negotiate with them, his statements were voluntary even though he was taking various pain killers as a result of a serious motorcycle accident), *cert. denied,* 503 U.S. 989, 112 S.Ct. 1680, 118 L.Ed.2d 397 (1992); *McCall v. Dutton,* 863 F.2d 454–61 (6th Cir.1988) (finding no coercion even though defendant was bleeding from four gunshot wounds and was interrogated while lying on the ground, handcuffed and surrounded by four to eight officers, some with guns drawn), *cert. denied,* 490 U.S. 1020, 109 S.Ct. 1744, 104 L.Ed.2d 181 (1989); *United States v. D'Antoni,* 856 F.2d 975, 982 (7th Cir.1988) (finding defendant capable of valid waiver despite lack of sleep and alleged ingestion of drugs and alcohol), *cert. denied,* 516 U.S. 969, 116 S.Ct. 429, 133 L.Ed.2d 345 (1995); *Wernert v. Arn,* 819 F.2d 613, 616 (6th Cir.1987) (finding defendant capable of a valid waiver despite alleged ingestion of drugs and alcohol the day before confession), *cert.*

*denied,* 484 U.S. 1011, 108 S.Ct. 711, 98 L.Ed.2d 662 (1988).

The courts also analyze the time that has elapsed between the reading of the rights and the statements, *see Evans v. McCotter,* 790 F.2d 1232, 1237–38 (5th Cir.) (holding that there was a valid waiver where the suspect was given warnings twice during a three-hour period), *cert. denied,* 479 U.S. 922, 107 S.Ct. 327, 93 L.Ed.2d 300 (1986); *United States ex rel. Patton v. Thieret,* 791 F.2d 543, 547–48 (7th Cir.) (finding valid waiver where warnings given within 40 minutes of the confession), *cert. denied,* 479 U.S. 888, 107 S.Ct. 284, 93 L.Ed.2d 259 (1986), the time lapse between arrest and arraignment, *see United States v. Jaswal,* 47 F.3d at 542 (noting that " 'a lapse of hours between arrest and arraignment, standing alone, does not require the exclusion of a statement made during the period' " and finding that statement was voluntary and that justifiable circumstances existed for delay) (quoting *United States v. Rubio,* 709 F.2d 146, 153 (2d Cir.1983)), and the nature of the waiver itself. *See North Carolina v. Butler,* 441 U.S. 369, 373, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979) (noting that an express waiver is "usually strong proof of the validity of that waiver"). Other factors considered by the courts are the location and atmosphere of the interrogation, *see Oregon v. Mathiason,* 429 U.S. 492, 494–95, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977), the length of the interrogation, *see Berkemer v. McCarty,* 468 U.S. 420, 437–38, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984), and the tone and language used by the police during the questioning. *See United States v. Guarno,* 819 F.2d 28, 31–32 (2d Cir.1987). It should also be noted that though a defendant may be handcuffed during interrogation, as Mallay was in this case, this is not *per se* evidence of involuntariness. *See, e.g., United States v. Seni,* 662 F.2d 277,

281 (4th Cir.1981), *cert. denied,* 455 U.S. 950, 102 S.Ct. 1453, 71 L.Ed.2d 664 (1982); *United States v. Ogden,* 572 F.2d 501, 503 (5th Cir.), *cert. denied,* 439 U.S. 979, 99 S.Ct. 564, 58 L.Ed.2d 650 (1978).

■ Mallay argues that like the officers' testimony as to their discovery of documents in plain view, their testimony regarding Mallay's *Miranda* waiver is created "out of whole cloth." (Mallay Supp. Mem. at 9). Mallay bases this argument on the lack of a written confirmation of the waiver either through a signed waiver form or in the interview report. (*See* Mallay Supp. Mem. at 11 (citing *United States v. Gaines,* 295 F.3d 293, 298 (2d Cir.2002) (noting explicitly that "[w]hile it would be preferable to have physical evidence supporting [the officer's] testimony … defendant points to no evidence that would establish clear error on the part of the district court in choosing to credit [the officer's] testimony over [that of the defendant]")). He also contends that the testimony of the two officers is contradictory, with Agent Kizenko recalling Detective Oldham giving the warnings at the Major Case Squad (Tr. II at 20–22), and Detective Oldham believing that he gave the warnings in the car or either in the apartment or the car. (*Id.* at 107, 127; Mallay Supp. Mem. at 10).

There is no dispute that Mallay was subjected to a custodial interrogation and that he was clearly entitled to receive advice of his rights under *Miranda.* While the government has not responded to the arguments raised by Mallay in his post-hearing submission, having observed the testimony of the two law enforcement officers, which this Court credits, I find that the defendant Mallay was fully advised of each of his constitutional rights as prescribed by *Miranda* prior to the interview.[25] I further find that he understood

---

**25.** Defendant was asked for pedigree information prior to the warnings being read. (Tr. II

those rights as evidenced by his responses to Detective Oldham's questions and his statement as recounted by both Agent Kizenko and Detective Oldham.

While clearly it would have been preferable to have a written waiver executed by Mallay, the Second Circuit has indicated that the absence of such a written waiver is not fatal to the government's case. *See United States v. Gaines*, 295 F.3d at 298. Instead, the appellate court in that case relied on the trial court's assessment of the credibility of the officers "because of its better vantage point from which to assess credibility." *Id. See also United States v. Rosa*, 11 F.3d 315, 329 (2d Cir.1993). Again, while Detective Oldham testified that he provided *Miranda* warnings to Mallay in the car and/or the apartment (Tr. II at 107, 127), and Agent Kizenko believed they were given in the office (*id.* at 20), Agent Kizenko cannot recall if he was present in the car (*id.* at 76), consistent with his failure to recollect any warnings being given there. Thus, the officers' statements are not in conflict, since Detective Oldham conceded that, consistent with Agent Kizenko's testimony, the warnings may also have been administered at the office. (Tr. at 127). Although defendant questions why the defendant would have been given *Miranda* warnings twice, the Court finds that this is not an unusual practice. *See, e.g., New York v. Harris*, 495 U.S. 14, 16, 110 S.Ct. 1640, 109 L.Ed.2d 13 (1990) (noting that officers read defendant his *Miranda* rights upon entering his apartment and again after taking him to station house); *Arizona v. Mauro*, 481 U.S. 520, 521–22, 107 S.Ct. 1931, 95 L.Ed.2d 458 (1987) (noting that defendant was advised of his *Miranda* rights upon

arrest and again upon arrival at police station); *Connecticut v. Barrett*, 479 U.S. 523, 525–26, 107 S.Ct. 828, 93 L.Ed.2d 920 (1987) (detailing that officers advised defendant of his *Miranda* rights upon arrival at police station, thirty minutes later when questioned, and for a third time before repeated questioning); *Lee v. Illinois*, 476 U.S. 530, 532, 106 S.Ct. 2056, 90 L.Ed.2d 514 (1986) (stating that defendant was given *Miranda* rights upon questioning, and again after being placed under arrest); *Evans v. McCotter*, 790 F.2d at 1234–35 (noting that defendant was given *Miranda* warnings upon arrest, upon arrival at police headquarters, and again before the justice of the peace, for a total of three times in less than six hours). This Court, therefore, concludes that the officers' testimony in this regard was credible.

Moreover, there is no evidence that Mallay was physically ill, intoxicated, or on any medication that affected his ability to understand his rights. The lapse of time between the reading of the rights and the statements was at most a matter of minutes, further suggesting that the statements were made voluntarily and in the absence of any undue pressure or coercion. The officers' description of the noncoercive circumstances surrounding the ensuing questioning and the nature of the responses given by Mallay demonstrate a knowing, voluntary, and intelligent waiver. *See North Carolina v. Butler*, 441 U.S. at 375–76, 99 S.Ct. 1755; *United States v. Spencer*, 995 F.2d at 12. Moreover, as set forth below in more detail, this Court credits the officers' testimony and finds no evidence of any request by Mallay to speak with an attorney. *See Davis v. United States*, 512

---

at 20). However, routine booking questions are not considered interrogation where the questions relate to identity, date of birth, or address, *see Pennsylvania v. Muniz*, 496 U.S. 582, 600–02, 110 S.Ct. 2638, 110 L.Ed.2d 528

(1990), or marital status. *See also United States ex rel. Hines v. LaVallee*, 521 F.2d 1109, 1112–13 (2d Cir.1975), *cert. denied*, 423 U.S. 1090, 96 S.Ct. 884, 47 L.Ed.2d 101 (1976).

U.S. 452, 459, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994) (noting that "the suspect must unambiguously request counsel").

In sum, under a totality of the circumstances, the Court finds that the statements made were completely voluntary. Thus, this Court respectfully recommends that defendant Mallay's motion to suppress his post-arrest statements, based on the alleged violation of his Fifth Amendment rights, be denied.

### C. James' Fifth and Sixth Amendment Claims

Claiming violations of the Fifth and Sixth Amendments, defendant James also seeks to suppress his pre-arrest statements made to the cooperating witness following the filing of the indictment, as well as his post-arrest statements made to the arresting officers.

#### 1) Statements to the Officers

■ Turning first to James' claim that his post-arrest statements made to the arresting officers should be suppressed, James raises Fifth Amendment voluntariness issues as well as Sixth Amendment concerns. James claims that because an indictment was pending against him at the time of his arrest, he had the right to be represented by counsel on the federal charges at the time he was questioned by the officers.

With respect to James' Fifth Amendment claim, the evidence demonstrates that after he was arrested by the officers, James was advised of his *Miranda* warnings and knowingly and voluntarily waived his right to counsel. Like defendant Mallay, James was read the *Miranda* warnings from a standard card issued by the NYPD. (Tr. II at 110, 150–51, 216). According to both Detective Oldham and Agent Kizenko, James acknowledged that he understood his rights and voluntarily

agreed to speak to the officers. (*Id.* at 149, 151, 234). There is no evidence that James' ability to understand was impaired in any way, by language or by physical or mental incapacity. Although he was most likely handcuffed during the interview (*see* Tr. II at 150, 218), that factor alone is not sufficient to justify a finding that the statements were not voluntary. *See United States v. Seni*, 662 F.2d at 281; *United States v. Ogden*, 572 F.2d at 503.

Defendant argues that the warnings should have been administered earlier, either in the car on the way to the Major Case Squad Office, or at the scene of the arrest. (*See* Tr. II at 214–18). However, the Court credits Detective Oldham's explanation that there was a degree of urgency that the officers felt required that James be removed from the scene as quickly as possible before any potential coconspirators learned of his arrest; otherwise, the officers were concerned that knowledge of his arrest would jeopardize any hope of meaningful cooperation from James. (Tr. II at 214).

While there is no evidence that James was coerced or physically threatened in any way (Tr. II at 149–50), defendant's counsel questioned Detective Oldham extensively about his threat to arrest James' girlfriend and perhaps other family members. (*Id.* at 180, 223–25). Although courts have ordered the suppression of statements made in response to truly outrageous government tactics, *see, e.g., United States v. Anderson*, 929 F.2d 96, 100–02 (2d Cir.1991) (holding confession involuntary where suspect was told he would be precluded from cooperating if he asked for a lawyer); *United States v. Duvall*, 537 F.2d 15, 19, 24 (2d Cir.) (finding coercion where prosecutor told suspect he faced a "possible sentence of a hundred years"), *cert. denied*, 426 U.S. 950, 96 S.Ct. 3173, 49 L.Ed.2d 1188 (1976), here there is no evi-

dence to suggest that the officers' conduct rose to such a level that it might be considered coercive. Similarly, while deceptive conduct by the police might be grounds for rendering a statement involuntary, *see Spano v. New York,* 360 U.S. 315, 323, 79 S.Ct. 1202, 3 L.Ed.2d 1265 (1959) (finding confession involuntary where police officer who was a close friend of the defendant represented that he could lose his job if defendant did not confess); *United States v. Ruggles,* 70 F.3d 262, 265 (2d Cir.1995) (holding that "[m]aterial misrepresentations based on unfulfillable or other improper promises might perhaps overbear a defendant's will"), *cert. denied,* 516 U.S. 1182, 116 S.Ct. 1284, 134 L.Ed.2d 229 (1996), other courts have found similar conduct not sufficiently coercive to render a confession involuntary. *See, e.g., Frazier v. Cupp,* 394 U.S. 731, 737, 739, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969) (holding police misrepresentation that defendant's cousin had confessed did not render defendant's confession involuntary); *Tankleff v. Senkowski,* 135 F.3d 235, 241, 244–45 (2d Cir. 1998) (holding defendant's statements not involuntary despite fact that police falsely represented that the victim had awakened from a coma and identified defendant).

In this case, while Detective Oldham concedes that he may have told James that his girlfriend was subject to possible arrest for her role in the fraudulent insurance scheme (*see* Tr. II at 223–25), there is no evidence to suggest that the officer was being anything but truthful with the defendant. Indeed, Detective Oldham testified that at the time, he believed that all of the defendant's relatives were potentially involved. (*Id.* at 225).

Thus, based on a totality of the circumstances, this Court concludes that James was advised of his rights and voluntarily waived his Fifth Amendment right to remain silent.

■■■■ James also argues that suppression is warranted because his Sixth Amendment right to counsel was violated. It is undisputed that where, as here, the defendant has been indicted at the time of his arrest, his Sixth Amendment right to counsel has attached. *See Kirby v. Illinois,* 406 U.S. 682, 688–90, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972) (noting the firmly established principle that the Sixth Amendment right to counsel attaches upon the initiation of adversarial judicial proceedings). The Sixth Amendment prohibits the government from interrogating or eliciting information in the absence of counsel once an individual has been indicted, *Massiah v. United States,* 377 U.S. 201, 206, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), and any statements made by the defendant to law enforcement officials are inadmissible unless they are shown to be the product of a voluntary, knowing and intelligent waiver of the defendant's Sixth Amendment rights. *See Patterson v. Illinois,* 487 U.S. 285, 292, 292 n. 4, 108 S.Ct. 2389, 101 L.Ed.2d 261 (1988); *Michigan v. Jackson,* 475 U.S. 625, 630, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986); *United States v. Kon Yu–Leung,* 910 F.2d 33, 38, 40 (2d Cir.1990).

■■■■ The Court concludes that the evidence suffices to establish a valid waiver of James' Sixth Amendment right to counsel related to the charges in the federal indictment. *See Patterson v. Illinois,* 487 U.S. at 291–96, 108 S.Ct. 2389; *see also United States v. Charria,* 919 F.2d 842, 848 (2d Cir.1990) (holding that *Miranda* warnings are sufficient to effect a valid waiver of Sixth Amendment rights post-indictment and that it is not constitutionally required that the defendant be informed that he is under indictment) (superseded by regulation on other grounds), *cert. denied,* 502 U.S. 813, 112 S.Ct. 62, 116 L.Ed.2d 38 (1991). This Court finds, based on the

evidence presented, that James was advised of his right to counsel and agreed voluntarily to answer questions. It was not until the end of the interview that James first requested an attorney at which time the questioning ceased. Thus, there is no basis on which to find a violation of James' right to counsel as a result of his post-arrest interrogation by the agents. *See Michigan v. Jackson,* 475 U.S. at 633 n. 6, 106 S.Ct. 1404 (noting that although the Sixth Amendment right to counsel does not turn on a defendant's request for an attorney, such a request is "an extremely important fact in considering the validity of a subsequent waiver in response to police-initiated interrogation").

Thus, while James' Sixth Amendment right to counsel had attached, this Court finds that until James invoked his right by expressing a desire to have counsel present during the questioning, he knowingly and voluntarily waived that right and spoke freely to the officers. Accordingly, this Court finds no basis on which to order suppression on this claim.

2) *Statements to the Cooperating Individual*

A somewhat more thorny question is presented by James' argument that his right to counsel was violated when the federal law enforcement officers proceeded to authorize and encourage the cooperating individual to question James in the absence of counsel, even though James' right to counsel had attached by virtue of the June 27, 2002 indictment charging him with conspiracy to travel and use the mail

and other interstate commerce facilities in the commission of murder for hire. (James Mem. at 29–31; *see* Indictment of June 27, 2002). In the conversation at issue here, the cooperating individual, Derrick Hassan, spoke to James at 8:35 p.m. on June 30, 2002, while driving James to the airport. In that conversation, the two discussed, among other things, picking up and cashing in certain tickets, James' intended trip to Guyana, and what appears to be plans for the cooperating individual to kill someone in the future, possibly on July 4, 2002. (*See* Transcript of undercover conversation dated June 30, 2002).[26]

a) *Scope of Sixth Amendment Rights*

■ Once judicial proceedings have been initiated against a defendant and his Sixth Amendment right to counsel has attached, law enforcement officers may not deliberately elicit a confession in the absence of counsel or a valid waiver. *See Maine v. Moulton,* 474 U.S. 159, 170, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985); *Brewer v. Williams,* 430 U.S. 387, 399–400, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977). To do so constitutes interference with a defendant's right to counsel and is a violation of the Sixth Amendment. *Id. See also Maine v. Moulton,* 474 U.S. at 171–76, 106 S.Ct. 477 (holding that "the prosecutor and police have an affirmative obligation not to act in a manner that circumvents and thereby dilutes the protection afforded by the right to counsel").

These principles apply whether the incriminatory statements are elicited overtly by law enforcement officers during an in-

---

**26.** By letter dated July 26, 2005, the government submitted draft transcripts of the conversations recorded by the cooperating witness with James, beginning on May 29, 2002. The only conversation that appears to have been recorded after the indictment is dated June 30, 2002. It is unclear whether the cooperating witness engaged in other conver-

sations with James between June 27, 2002 and the arrest. If so, the principles relating to the suppression of the June 30, 2002 recording would also apply to any testimony of the cooperating witness regarding his recollection of other unrecorded post-indictment conversations.

terrogation or covertly by individuals cooperating with the government. *See, e.g., United States v. Henry,* 447 U.S. 264, 272, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980) (finding that the government had " 'deliberately elicited' incriminating statements" from the defendant, who had appointed counsel, by instructing a paid jailhouse informant to pay attention to statements made by the defendant but not to initiate any conversations or question the defendant); *Massiah v. United States,* 377 U.S. 201, 206, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964) (holding that an indicted and represented defendant's Sixth Amendment rights were violated when a government agent installed a radio transmitter in the car of a cooperating co-defendant who then recorded the ensuing incriminating conversation); *see also Maine v. Moulton,* 474 U.S. at 176–77, 106 S.Ct. 477 (finding violation of Sixth Amendment right when the government arranged to record conversations between defendant and his co-defendant). In both *Maine v. Moulton* and *United States v. Henry,* the Supreme Court rejected the government's argument that suppression was not warranted because it had taken steps to instruct the informant not to elicit statements regarding the charged offense. *See Maine v. Moulton,* 474 U.S. at 177 n. 14, 106 S.Ct. 477; *United States v. Henry,* 447 U.S. at 271 n. 8, 100 S.Ct. 2183.

However, the Court also has made it clear that the Sixth Amendment rights enunciated in *Massiah* and *Brewer* are "offense specific." Thus, in *McNeil v. Wisconsin,* 501 U.S. 171, 175, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991), the Supreme Court clarified its ruling in *Michigan v. Jackson,* 475 U.S. 625, 636, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986), holding that the Sixth Amendment right to counsel and "its *Michigan v. Jackson* effect of invalidating subsequent waivers in police-initiated interviews [are] offense-specific." The defendant in *McNeil* had been arrested on an armed robbery charge and requested the assistance of an attorney at the bail hearing, thereby triggering his Sixth Amendment right to counsel. He was subsequently advised of his *Miranda* rights and interviewed by police officers regarding a separate murder, about which he made several incriminating statements. The Court rejected the defendant's argument that his request for counsel at the bail hearing invoked both his Sixth Amendment and Fifth Amendment rights to counsel, and that his statements regarding the separate, uncharged offense should have been suppressed. *McNeil v. Wisconsin,* 501 U.S. at 177, 111 S.Ct. 2204. With respect to the Sixth Amendment claim, the Supreme Court held that statements arising from post-arraignment interrogations regarding separate offenses are admissible and did not fall under the *Jackson* rule.[27] *Id.* at 179, 111 S.Ct. 2204; *see also Maine v. Moulton,* 474 U.S. at 180 n. 16, 106 S.Ct. 477 (noting, "[i]ncriminating statements pertaining to other crimes, as to which the Sixth Amendment right has not yet attached, are, of course, admissible at a trial of those offenses"). The Court further stated that the Sixth Amendment right "cannot be invoked once for all future prosecutions, for it does not attach until a prosecution is commenced, that is, at or

27. With respect to a defendant's Fifth Amendment right to counsel, the Court stated that, in order to invoke the Fifth Amendment right to counsel, there must be "at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney *in dealing with cus-*

*todial interrogation by the police." McNeil v. Wisconsin,* 501 U.S. at 178, 111 S.Ct. 2204 (emphasis in original). Thus, in the absence of a showing that the defendant made a specific request to have an attorney present during questioning, there is no violation of the Fifth Amendment.

after the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." *Id.* at 174, 106 S.Ct. 477 (citations and internal quotations omitted). In *Moulton,* the Court explained that "to exclude evidence pertaining to charges as to which the Sixth Amendment right to counsel had not attached at the time the evidence was obtained, simply because other charges were pending at that time, would unnecessarily frustrate the public's interest in the investigation of criminal activities." *Maine v. Moulton,* 474 U.S. at 179–80, 106 S.Ct. 477.

Following the Court's enunciation of an "offense-specific" rule, several lower courts held that there was an exception where an individual who faced pending charges to which the right to counsel had attached was questioned regarding new charges that were "closely related" or arose out of the same set of facts or circumstances. *See United States v. Arnold,* 106 F.3d 37, 41 (3d Cir.1997) (adopting the "closely related" exception and applying it in a case where the defendant was interrogated on witness tampering charges after he had retained counsel and invoked his Sixth Amendment right in connection with bank larceny charges); *United States v. Laury,* 49 F.3d 145, 150 n. 11 (5th Cir.) (noting in a footnote that "[t]he Sixth Amendment applies only to the specific charged offense.... If, however, the charges to which the Sixth Amendment right has been invoked and the new charges are 'inextricably intertwined,' then the Sixth Amendment right may extend to the new charges") (citations omitted), *cert. denied,* 516 U.S. 857, 116 S.Ct. 162, 133 L.Ed.2d 105 (1995); *United States v. Hines,* 963 F.2d 255, 257–58 (9th Cir.1992) (finding "[a]n exception to the offense-specific requirement of the Sixth Amendment occurs when the pending charge is ... inextricably intertwined with the charge under investigation") (citing *United States v. Cooper,* 949 F.2d 737, 743–44 (5th Cir.1991), *cert. denied,* 504 U.S. 975, 112 S.Ct. 2945, 119 L.Ed.2d 569 (1992)).

However, in *Texas v. Cobb,* 532 U.S. 162, 165, 121 S.Ct. 1335, 149 L.Ed.2d 321 (2001), the Supreme Court explicitly rejected the expansion of the Sixth Amendment right to offenses " 'closely related factually' " to the charged offense, reaffirming the "offense-specific" rule of *McNeil v. Wisconsin,* 501 U.S. 171, 111 S.Ct. 2204, 115 L.Ed.2d 158. The Court made it clear that the Sixth Amendment right to counsel does not attach to an uncharged crime unless the charged offense and the uncharged offense require proof of the same facts. *Texas v. Cobb,* 532 U.S. at 173, 121 S.Ct. 1335 (holding that defendant charged with burglary could waive his Fifth Amendment *Miranda* rights and be questioned about two murders he committed during the course of the burglary without violating defendant's Sixth Amendment rights). In reaffirming the offense-specific rule, the Court relied on the definition of "offense" set out in *Blockburger v. United States,* 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932), which delineated the scope of the Double Jeopardy Clause. *See Texas v. Cobb,* 532 U.S. at 173, 121 S.Ct. 1335. The Court noted that there was "no constitutional difference between the meaning of the term 'offense' in the contexts of double jeopardy and of the right to counsel." *Id.* Under *Blockburger,* " 'where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires *proof of a fact which the other does not.*' " *Id.* (quoting *Blockburger,* 284 U.S. at 304, 52 S.Ct. 180) (emphasis added). Thus, under the holding in *Texas v. Cobb,* "when the Sixth Amend-

ment right to counsel attaches, it does encompass offenses that, even if not formally charged, would be considered the same offense under the Blockburger test." *Texas v. Cobb,* 532 U.S. at 173, 121 S.Ct. 1335.

Prior to *Cobb,* the Second Circuit, in evaluating claims of double jeopardy, had enunciated a broader approach that held that even where two offenses are charged under two statutes that require proof of different elements, the offenses may be considered the same, if one of the statutes "covers a broad range of conduct." *United States v. Liller,* 999 F.2d 61, 63 (2d Cir.1993). Under those circumstances, the courts were permitted to "examine the allegations of the indictment rather than only the terms of the statutes" to determine if the offenses were different. *Id.; see also United States v. Zvi,* 168 F.3d 49, 57 (2d Cir.1999) (finding multiplicitous two counts charging domestic and international money laundering where the same transactions were involved in both crimes); *United States v. Seda,* 978 F.2d 779, 781 (2d Cir.1992) (holding that bank fraud and false loan application charges were the same for double jeopardy purposes, because filing false loan applications was "simply a species of bank fraud," and noting that "[t]he Supreme Court has recognized that the rigid 'look-only-at-the-statute' approach is inappropriate in some cases where one of the statutes covers a broad range of conduct .... Some statutes covering a broad range of conduct can apply simultaneously with more focused statutes to result in multiple punishment for one act") (citing *Whalen v. United States,* 445 U.S. 684, 694, 100 S.Ct. 1432, 63 L.Ed.2d 715 (1980)).

In *United States v. Chacko,* however, the Second Circuit announced that the *Seda* test, which "examine[d] the specifics of the indictment and the nature of the

counts charged when the underlying statute [was] broad," was overruled because it applied a broader test than that set forth in *Blockburger,* 169 F.3d 140, 146–47 (2d Cir.1999). The Court held that "[i]t is not determinative whether the same conduct underlies the counts; rather, it is critical whether the 'offense'—in the legal sense, as defined by Congress—complained of in one count is the same as that charged in another. *Id.* at 146 (citing, *inter alia, United States v. Dixon,* 509 U.S. 688, 704, 113 S.Ct. 2849, 125 L.Ed.2d 556 (1993), as "overruling test of 'same conduct' ").

Since the Court's holding in *Texas v. Cobb,* the Second Circuit has further observed that "[p]rior to *Cobb,* some lower courts had held that the right to counsel attached to uncharged crimes that were 'factually related' to a specifically charged offense. *Cobb* rejected this approach." *United States v. Mills,* 412 F.3d 325, 329 n. 1 (2d Cir.2005) (citing *Texas v. Cobb,* 532 U.S. at 167–68, 121 S.Ct. 1335; lower court citations omitted). *See also Campbell v. Burgess,* 367 F.Supp.2d 376, 382 (W.D.N.Y.2004) (discussing *Cobb* 's rejection of standard considering "conduct" that is "closely related" or "inextricably intertwined" to be one offense).

### b) *Application*

▉ In the instant case, defendant James argues that his Sixth Amendment protections attached at the time of his first indictment on June 27, 2002, and that all subsequent statements made to the government's informant should be suppressed as the product of unconstitutional interrogation. (James Mem. at 29–32; James Supp. Mem. at 13–14). It is clear, however, that the statements made to the informant are not being offered to support the charge contained in the initial indictment; that charge was dropped and not included in the Third Superseding Indictment that

is currently at issue. Moreover, the government argues that the statements are offered as evidence of new, separate charges, to which James' right to counsel had not attached. The government argues that the offense-specific rule of *Texas v. Cobb,* 532 U.S. at 173, 121 S.Ct. 1335, renders the statements admissible as evidence of these new charges. (Govt's. Mem. at 57;[28] Govt's. Reply Mem. at 8).

As an initial matter, defendant fails to appreciate the offense-specific nature of the Sixth Amendment protection. While counsel for defendant James briefly reference the distinction (*see* James Supp. Mem. at 10, 12; James Mem. at 31), they offer only that the Supreme Court has recently reaffirmed its commitment to exclude evidence obtained in violation of a defendant's Sixth Amendment rights, citing *Fellers v. U.S.,* 540 U.S. 519, 124 S.Ct. 1019, 157 L.Ed.2d 1016 (2004). (James Supp. Mem. at 10). *Fellers,* however, did not consider a case in which post-indictment statements were introduced as evidence for a crime other than the one originally charged. *See United States v. Fellers,* 397 F.3d 1090, 1099 (8th Cir.2005) (equating elements of originally charged offense with those of additional conviction), *on remand from* 540 U.S. 519, 124 S.Ct. 1019, 157 L.Ed.2d 1016. Rather, in *Fellers,* the defendant, who had been indicted on charges of conspiracy to distribute methamphetamine, made a series of inculpatory statements about his role in the actual charged offense prior to receiving his warnings. The Court held that even though there was no "interrogation," the officers "deliberately elicited" statements in the absence of a waiver of Feller's Sixth Amendment rights. *Fellers v. United States,* 540 U.S. at 524–25, 124 S.Ct. 1019. The Court in *Fellers* was not

asked to consider and thus did not consider, the issue presented in *Texas v. Cobb,* namely, the admissibility of statements regarding unindicted offenses, requiring different elements of proof. Thus, the holding in *Cobb* remains settled.

Defendant argues that "[t]he only factor supporting the government here is the subsequent, although wholly transparent, decision to supersede the original charge with a reworded one that merely changes the government's theory but not the charge itself." (James Supp. Mem. at 12). Defendant argues that Counts Six, Seven, Ten, Eleven and Thirteen of the Third Superseding Indictment charge James with violations of the same section of the United States Code that was charged in the original indictment and thus, the statements made to the informant should be suppressed as the product of a Sixth Amendment violation. (*Id.* at 13).

Turning first to Counts Six and Ten of the Third Superseding Indictment of May 21, 2004, defendant is correct that the charging language of these two counts is substantially identical to the charge in the original indictment of June 27, 2002 (James Supp. Mem. at 13), but defendant ignores two significant differences. Both the charge in the original indictment and the charges set forth in Counts Six and Ten of the Superceding Indictment charge defendant James with violating Title 18, United States Code, Section 1958, conspiracy to use facilities of interstate commerce in the commission of murder for hire. The charge in the original indictment of June 27, 2002 reads:

> On or about and between April 2002 and June 27, 2002 ... the defendant Richard James, together with others, knowingly and intentionally conspired to travel and

---

**28.** Citations to "Govt's. Mem." refer to the Government's Memorandum of Law in Opposition to Defendants' Pretrial Motions, filed May 20, 2005.

cause another to travel in foreign commerce and use and cause others to use the mail and other facilities in interstate commerce, with intent that a murder be committed, in violation of Section 125.25 of the New York Penal Law, as consideration for the receipt of, and as consideration for a promise and agreement to pay, something of pecuniary value.

(Indictment of June 27, 2002). Similarly, Count Six of the Third Superceding Indictment charges defendant James with conspiracy to travel and to use the mail and other facilities of interstate commerce in the commission of the murder for hire of Hardeo Sewnanan, in violation of 18 U.S.C. § 1958, and Count Ten charges the same offense with respect to the murder for hire of Basdeo Somaipersaud. (*See* Third Superceding Indictment of May 21, 2004, Counts Six and Ten). The charging language of both Counts Six and Ten reads as follows:

> ... defendants Richard James ..., together with others, knowingly and intentionally conspired to travel and cause another to travel in interstate and foreign commerce and to use and cause another to use the mail and a facility in interstate commerce, with intent that a murder be committed, in violation of New York Penal Law Section 125.25(1), as consideration for the receipt of, and as consideration for a promise and agreement to pay, something of pecuniary value, and the death of [Hardeo Sewnanan ... and the death of Basdeo Somaipersaud] did result.

(Third Superceding Indictment of May 21, 2004, Counts Six and Ten (variations noted in brackets)).

While this language is virtually identical to the language charged in the original indictment, it is clear from the dates charged in the various counts that the conspiracies charged in the Third Su-

perseding Indictment are different from the conspiracy charged in the original indictment, in that the charge in the original indictment relates to a conspiracy to murder a different individual from the ones who are named as the victims described in Counts Six and Ten. The conspiracy charged in Count Six relating to the murder for hire of Hardeo Sewnanan encompasses the time period between January 1996 and June 8, 1999; the conspiracy charged in Count Ten relating to the murder for hire of Basdeo Somaipersaud encompasses the period between January 1994 and January 23, 1998. By contrast, the conspiracy charged in the original indictment is alleged to have begun in April 2002 and lasted only until June 27, 2002, long after the other two alleged conspiracies terminated. Thus, even though the individual who was the alleged victim of the murder for hire conspiracy charged in the original indictment was not named in that indictment, it is clear that the object of that original conspiracy was someone other than Mr. Sewnanan or Mr. Somaipersaud, both of whom were killed before the April 2002 conspiracy allegedly began. (*See* Third Superseding Indictment, Counts Six, Seven, Eight, Nine, Ten). Thus, because the offenses charged in Counts Six and Ten are different offenses from the one charged in the original indictment, *see United States v. Nocella,* 849 F.2d 33, 38 (1st Cir.1988) (holding that there is no Sixth Amendment violation where defendant indicted on marijuana charges made statements to a cooperating witness which were later offered in trial on cocaine and witness tampering charges, noting that the "later-charged crimes were independent of, and distinct from, the earlier-charged crime"); *United States v. Batista,* 834 F.2d 1, 2–3 (1st Cir.1987) (finding no Sixth Amendment violation where defendant, facing indictment on state charges relating to cocaine distribution,

made statements which were then used in connection with unrelated, separate federal cocaine distribution charges and noting that the two crimes were "separate offense[s]" involving different amounts of cocaine), the Court finds that, under the offense-specific rule of *Cobb* and *Blockburger*, defendant James' Sixth Amendment right to counsel had not attached to the charges set forth in Counts Six and Ten. Thus, the statements made by James after his indictment on June 27, 2002, in the absence of counsel, were not obtained in violation of his Sixth Amendment rights insofar as these counts were concerned.

As to the remaining counts, this Court also finds that, under the *Blockburger* test, each statutory charge is distinct, requiring proof of an additional element beyond that of the charge in the original indictment. While defendant argues that Counts Seven, Eleven, and Thirteen charge violations of Section 1958, as is charged in the original indictment (*see* James Supp. Mem. at 13), these three counts do not charge participation in a conspiracy, which is the charge in the original indictment. Rather, Counts Seven and Eleven charge the actual use of the mail and facilities of interstate commerce in the commission of murder for hire. Moreover, as with Counts Six and Ten, Counts Seven and Eleven relate to different crimes, different victims, and different time periods from that charged in the original indictment, which is alleged to have begun long after the offenses in Counts Seven and Eleven were committed.

As for Count Thirteen, which charges the attempted murder[29] of John Narine-

singh, "in or about and between January 1999 and June 2002," there is no question that the nature of the indicted conspiracy charge and the later filed substantive charge are "closely related" or "inextricably intertwined" and clearly arise from the same series of incidents. *See United States v. Arnold,* 106 F.3d at 41; *United States v. Laury,* 49 F.3d at 150 n. 11. However, the Supreme Court has made it clear that these tests no longer apply and this Court must look to the *Blockburger* elements to determine if the same offenses are involved. *Texas v. Cobb,* 532 U.S. at 173, 121 S.Ct. 1335.

Conspiracy to commit an offense is a separate crime from the substantive offense itself. *See United States v. Felix,* 503 U.S. 378, 390–91, 112 S.Ct. 1377, 118 L.Ed.2d 25 (1992); *United States v. McGowan,* 58 F.3d 8, 13 (2d Cir.1995) (making clear that, for purposes of determining double jeopardy under *Blockburger*, "[t]he attachment of jeopardy as to the trial of a conspiracy does not bar subsequent trial of a substantive offense that was an objective of the conspiracy"). Indeed, RICO and RICO conspiracy charges have been found to be separate offenses even where the predicate acts charged are conspiracies. *See United States v. Coonan,* 938 F.2d 1553, 1566 (2d Cir.1991), *cert. denied,* 503 U.S. 941, 112 S.Ct. 1486, 117 L.Ed.2d 628 (1992); *see also United States v. Sessa,* 125 F.3d 68, 72–73 (2d Cir.1997), *cert. denied,* 522 U.S. 1065, 118 S.Ct. 731, 139 L.Ed.2d 669 (1998). In this case, the charge in the initial indictment required proof that defendant James "conspired" or agreed with others to commit an

---

**29.** Although Count Thirteen is labeled "(Attempted Murder of John Narinesingh)," the charge itself reads in relevant part as follows: "In or about and between January 1999 and June 2002...the defendant Richard James, together with others, did knowingly and intentionally use and cause another to use the

mail and a facility in interstate commerce, with intent that a murder be committed, in violation of New York Penal Law Section 125.25(1), as consideration for the receipt of, and as consideration for a promise and agreement to pay, something of pecuniary value," in violation of 18 U.S.C. § 1958.

offense, namely, murder for hire. No such agreement is required to be proved in order to establish a violation of the Section 1958 charge set out in Count Thirteen of the Third Superseding Indictment. All that is charged is the substantive offense of "us[ing] and caus[ing] another to use the mail and a facility in interstate commerce" in connection with a murder for hire.[30] Moreover, the initial indictment also charged that the defendant James conspired "to travel and cause another to travel in foreign commerce," an element that was not alleged in Count Thirteen of the Third Superseding Indictment. Since charges of conspiracy have been found to be separate offenses from substantive charges for double jeopardy purposes, the Court is constrained to find that the charge in the initial indictment is a separate offense from the attempted murder charge set forth in Count Thirteen of the Third Superseding Indictment.

Finally, Count Twelve also relates to the murder of John Narinesingh, the individual discussed during the conversation between James and the cooperating individual. Count Twelve, however, charges defendant James with soliciting the murder of John Narinesingh, in violation of 18 U.S.C. § 1959(a)(1), and 18 U.S.C. § 373. Not only is this charge based on different statutory provisions than the one charged in the initial indictment, 18 U.S.C. § 1958, but there are clearly different elements that the government must prove in order to satisfy its burden under these charges. For example, in order to satisfy the elements of the Section 1959(a)(1) charge of solicitation to murder, the government must establish that the acts were engaged in "as consideration for the receipt of, or as a consideration for a promise or agreement to pay, *anything of pecuniary value from an enterprise engaged in racketeering activity, or for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity . . . .*" 18 U.S.C. § 1959(a) (emphasis added). In order to prove the original conspiracy to murder charge, the government is *not* required to prove the existence of a racketeering enterprise or that the conspiracy was connected to a racketeering enterprise in any way.

Accordingly, it is respectfully recommended that James' motion to suppress the recorded conversations based on violations of his Sixth Amendment right to counsel be denied.

## D. *The Wade Hearing*

Defendants James and Mallay seek to suppress an out-of-court identification made by a government witness, arguing that the photographs which were shown to the witness were unduly suggestive, in that the five photographs depicted only the three male defendants indicted in this case, along with Ms. Peter and an unindicted individual, Malini Ramnarine, who is the girlfriend of defendant James. Defendants argue that given the suggestive nature of the identification process, the out-of-court identification by the witness as

---

**30.** Even if the charge is one of "attempted" murder as opposed to the actual murder, the elements necessary to prove an "attempt" are different from those required to prove a conspiracy. In order to prove attempt, the government need not show that the defendant acted in concert with anyone or agreed with anyone to engage in the conduct at issue, but the government must establish that the defendant intended to commit the crime charged and that he willfully took some action that was a "substantial step" toward the commitment of the crime. *See United States v. Ivic,* 700 F.2d 51 (2d Cir.1983), *overruled on other grounds, National Org. for Women, Inc. v. Scheidler,* 510 U.S. 249, 261, 114 S.Ct. 798, 127 L.Ed.2d 99 (1994); *United States v. Mowad,* 641 F.2d 1067 (2d Cir.), *cert. denied,* 454 U.S. 817, 102 S.Ct. 94, 70 L.Ed.2d 86 (1981).

well as any in-court identification must be suppressed as tainted.

### 1) Legal Standards

It is well-established that an out-of-court identification will be set aside only when the identification procedures are "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States,* 390 U.S. 377, 384, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968); *see also Stovall v. Denno,* 388 U.S. 293, 302, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967) (overruled on other grounds) (holding that identification testimony is subject to suppression only when the procedures are "so unnecessarily suggestive and conducive to irreparable mistaken identification" as to constitute a violation of due process). The claim is one that should be evaluated in light of the totality of the circumstances, *see Simmons v. United States,* 390 U.S. at 383, 88 S.Ct. 967, and in each case, the court must initially make a determination based on the facts of the particular case as to whether the pretrial identification process used was "unnecessarily suggestive or prejudicial." *United States v. Richardson,* 837 F.Supp. 570, 573 (S.D.N.Y.1993) (citing *Simmons v. United States,* 390 U.S. at 384, 88 S.Ct. 967).

Thus, where there has been a pretrial identification, the courts employ a two-step inquiry. The first step requires a determination of whether the procedures were unduly suggestive. *See United States v. Maldonado–Rivera,* 922 F.2d 934, 973 (2d Cir.1990), *cert. denied,* 501 U.S. 1233, 111 S.Ct. 2858, 115 L.Ed.2d 1025, 1026 (1991). If a determination is made that the pre-trial identification procedure was not unduly suggestive, then there is no need to proceed to the second step of the analysis; the identification will be admitted and any concerns relating to the reliability of the identification go only to the weight of the evidence and not to its admissibility. *See United States v. Thai,* 29 F.3d 785, 808 (2d Cir.), *cert. denied,* 513 U.S. 977, 115 S.Ct. 456, 130 L.Ed.2d 364 (1994); *United States v. Maldonado–Rivera,* 922 F.2d at 973. However, if the court determines that the identification procedures used were impermissibly suggestive, then the court must weigh the suggestiveness of the procedure with factors suggesting that an in court-identification is independently reliable. The testimony may be admissible if the court finds the identification to be "independently reliable rather than the product of the earlier suggestive procedures." *United States v. Maldonado–Rivera,* 922 F.2d at 973; *see also United States v. Ciak,* 102 F.3d 38, 42 (2d Cir.1996); *United States v. Thai,* 29 F.3d at 808.

In determining whether a photo array is impermissibly suggestive, the courts look to a number of factors, including the number of individuals displayed in the photo array, and "whether the picture of the accused, matching descriptions given by the witness, so stood out from all of the other photographs as to 'suggest to an identifying witness that [that person] was more likely to be the culprit.'" *Jarrett v. Headley,* 802 F.2d 34, 41 (2d Cir.1986) (quoting *United States v. Archibald,* 734 F.2d 938, 940 (2d Cir.1984), *modified,* 756 F.2d 223 (2d Cir.1984)); *see also United States v. Wong,* 40 F.3d 1347, 1359–60 (2d Cir.1994), *cert. denied,* 516 U.S. 870, 116 S.Ct. 190, 133 L.Ed.2d 127 (1995). Thus, while the photographs need not be uniform, "[t]he array must not be so limited that the defendant is the only one to match the witness's description of the perpetrator." *United States v. Maldonado–Rivera,* 922 F.2d at 974. Courts have found the pretrial identification procedures to be impermissibly suggestive where the defen-

dant in a photo array was the only one with the skin color described by the witness. *See United States v. Fernandez,* 456 F.2d 638, 641–43 (2d Cir.1972). Moreover, courts have generally held that a photo array containing six or more photographs is sufficiently large so as not to be unduly suggestive. *See, e.g., United States v. Thai,* 29 F.3d at 808 (collecting cases).

■■■ The other factor that the courts examine in determining whether to admit identification testimony is the manner in which the identification procedure is conducted by the law enforcement officers. Courts take into consideration any suggestive remarks or utterances made by the police officers conducting the lineup or photo array. *See generally* Ferdinand Tinio, Annotation, *Admissibility of evidence of lineup identification as affected by allegedly suggestive lineup procedures,* 39 A.L.R.3d 487, 1971 WL 28539, § 12 (1971 & Supp.2005) (collecting cases finding suggestive remarks made by officers to witnesses). Thus, even where the photo array itself may not be suggestive, the actions or remarks of the officers and the manner in which they present the array may render an otherwise fair array impermissibly suggestive. *See United States v. Thai,* 29 F.3d at 810 (citing *United States v. Jarvis,* 560 F.2d 494, 500 (2d Cir.1977), *cert. denied,* 435 U.S. 934, 98 S.Ct. 1511, 55 L.Ed.2d 532 (1978)). In examining the procedures used by law enforcement officials, the courts consider not only the officer's comments in presenting the array, but also the manner of presentation. *United States v. Maldonado–Rivera,* 922 F.2d at 974, including whether the witness's initial identification was positive or tentative, whether there were repeated showings of the selected photo-

graph in isolation, whether the officer's conduct influenced the identification by conducting a show up or pressuring the witness to take additional looks at the suspect, *see Jarrett v. Headley,* 802 F.2d at 41–42 (citing cases), and whether the officer made suggestive comments prior to the identification. However, comments including "we can't just take a 'possibly,'" made by a police officer to an identifying witness prior to a lineup, *see United States v. Wong,* 40 F.3d at 1358–59, and "'stick to your guns,'" made by a prosecutor to a witness before trial, *see Jarrett v. Headley,* 802 F.2d at 46, have been found not to be impermissibly suggestive.

■■■ Where the pretrial identification procedures are impermissibly suggestive, a later in-court identification may be considered tainted and a violation of due process unless the court determines that the in-court identification is independently reliable. *See Jarrett v. Headley,* 802 F.2d at 42. Suppression of a witness's identification will not be required if it can be shown that the impermissibly suggestive procedure did not influence the witness's identification, where, for example, the "witness's identification was already positive." *United States v. Wong,* 40 F.3d at 1362 (quoting *Jarrett v. Headley,* 802 F.2d at 41–42).

*2) Application*

On September 22, 2005, this Court held a hearing on the issue of the identification procedures used by the agents with respect to a prospective government witness in Guyana. Agent Kizenko testified that on February 9, 2004, he met in the Woodbine Hotel in Georgetown, Guyana (the "Hotel") with an individual believed to have information relating to the investigation. (9/22/05 Tr. at 5, 21).[31] Present with

---

**31.** Citations to "9/22/05 Tr." refer to pages in the transcript of the Wade hearing held before

this Court on September 22, 2005.

Agent Kizenko during this meeting with the prospective witness were Detective Oldham and Agent Heitz. (*Id.* at 5). Although Agent Kizenko could not recall whether someone from his group or someone from the Hotel arranged the meeting with the witness, he testified that he had never spoken to the witness prior to that day. (*Id.* at 10–11).

The officers met with the witness at a table in the Hotel restaurant. (*Id.* at 10). After introducing themselves, the officers told the witness that they would like to show him a series of photographs. (*Id.* at 8, 27).[32] The witness agreed to look at the photographs. (*Id.* at 27). The officers then proceeded to show the witness five photographs, one photograph at a time. (*Id.* at 13). The individuals depicted in the five photographs were defendants James, Mallay, Motillal, Peter and Malini Ramnarine, James' girlfriend. (*Id.* at 6, 21–22). Although Agent Kizenko could not recall the exact order in which the photographs were shown to the witness (*id.* at 28, 32), he testified that immediately upon seeing the picture of Richard James, the witness stated in substance, "That's Richard James." (*Id.* at 6–7, 33). Similarly, when shown the photograph of Ronald Mallay, the witness again recognized him immediately and stated in substance that the photograph was of "Ronald Mallay." (*Id.* at 6–7, 33). The witness did not recognize any of the other photographs. (*Id.* at 7).

Agent Kizenko testified that prior to showing the witness the photographs, the officers did not tell him what they were investigating (*id.* at 8, 14), did not indicate

in any way who the photographs depicted (*id.* at 7), nor did they mention the defendants' names. (*Id.* at 23). Only after the witness identified the photographs of James and Mallay, indicating not only that he recognized them, but also identifying them by their full names, did officers question the witness as to how he knew them. (*Id.* at 24–25). Agent Kizenko further testified that there no threats or promises made to the witness at any time during the identification process (*id.* at 7), nor did the officers state anything to the witness after his identification, either confirming or denying the accuracy of his identification. (*Id.* at 25).

Although Agent Kizenko testified that notes were taken and a report made of the interview of the witness (*id.* at 34), he was not certain if anyone made any report or took notes regarding the identification process itself. (*Id.* at 34–35). The witness was also not asked to sign or date any of the photographs. (*Id.* at 31).[33]

■ Based on the testimony of Agent Kizenko, which this Court credits, the Court finds that the procedures used in displaying the photographs in this instance to the witness were not suggestive in any way. Defendants have presented no evidence to suggest that the officers made any statements or gestures suggesting to the witness the identity of the individuals depicted in the photographs. Moreover, given that the witness immediately identified James' and Mallay's photographs by first and last name, and informed the officers that he had known the two defendants

---

**32.** Agent Kizenko could not recall which of the officers actually showed the photographs to the witness or which of them actually spoke to him prior to showing him the photographs. (*Id.* at 6).

**33.** Agent Kizenko conceded that it was sometimes the practice to have the witness sign

and date the photographs he or she had seen. (*Id.* at 31). In this case, however, Agent Kizenko, did not have the witness initial the photographs, because the witness described his knowledge and prior contact with the defendants. (*Id.* at 31–32).

for some time from his work as a cab driver in Guyana (*id.* at 6, 16, 20), the Court concludes that there is no basis on which to suppress the out-of-court identification by this witness, nor to preclude the witness from identifying the defendants at the time of trial.

Accordingly, this Court respectfully recommends that defendants James and Mallay's motions to suppress the photograph identification of this witness be denied.

### E. *Documents Submitted for In Camera Review*

On October 12, 2005, this Court issued a Report and Recommendation relating to various discovery motions filed by defendants in this action, including a motion seeking to require the government to disclose certain information relating to a potential government witness, Camuldeen Allie. The defendants argued that they had a good faith basis for believing that the government was withholding certain *Brady* and *Giglio* material that should be disclosed relating to Mr. Allie's role in the murder of Vernon Peter and statements that Mr. Allie may have made that would exculpate the defendants. In the Report issued by this Court on October 12, 2005, this Court Ordered the government to produce copies of its files relating to Mr. Allie for *in camera* review.

Having now reviewed the files and videotape submitted by the government, the Court hereby Orders the government to produce the Order, dated May 20, 1994, issued by a Justice of the Supreme Court, County of Queens, to the Department of Correction, New York City, to convey Camuldeen Allie to the custody of Riker's Island Mental Health Center Admissions Unit. Further, the Court relies on the government's representation in its letter of October 24, 2005 to defendants' counsel that it has produced to counsel the psychi-

atric reports for Camuldeen Allie dated December 20, 1993, May 9, 1994, and July 20, 1994. Finally, the Court awaits delivery of an unredacted copy of one document from the government. The Court will issue a decision regarding the production of this document upon its receipt.

Any objections to this Report and Recommendation must be filed with the Clerk of the Court, with a copy to the undersigned, within ten (10) days of receipt of this Report. Failure to file objections within the specified time waives the right to appeal the District Court's order. *See* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72; *Small v. Secretary of Health & Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989).

The Clerk is directed to mail copies of this Report and Recommendation to the parties.

**SO ORDERED.**

November 10, 2005.